## TEXAS *v.* FLORIDA ET AL.

No. 11, Original. Argued February 7, 1939.—Decided March 13, 1939.

*Messrs. William McCraw,* Attorney General of Texas, and *Llewellyn B. Duke,* First Assistant Attorney General.

with whom *Mr. Wm. Madden Hill,* Assistant Attorney General, was on the brief, for complainant.

*Mr. Seth T. Cole,* with whom *Messrs. John J. Bennett, Jr.,* Attorney General of New York, *Mortimer M. Kassell,* and *William M. O'Reilly* were on the brief, for the State of New York, defendant.

*Messrs. George Couper Gibbs,* Attorney General of Florida, and *Edgar G. Hamilton,* with whom *Mr. H. E. Carter,* Assistant Attorney General, was on the brief, for the State of Florida, defendant.

*Mr. Edward O. Proctor,* Assistant Attorney General, with whom *Messrs. Paul A. Dever,* Attorney General of Massachusetts, *Henry F. Long,* and *T. Ludlow Chrystie* were on the brief, for the Commonwealth of Massachusetts, defendant.

*Messrs. Harrison Tweed, Timothy N. Pfeiffer, Walter E. Hope,* and *George W. Jaques* submitted for Wilks, defendant.

MR. JUSTICE STONE delivered the opinion of the Court.

This original suit, in the nature of a bill of interpleader, brought to determine the true domicile of decedent as the basis of rival claims of four states for death taxes upon his estate, raises two principal questions: Whether this Court has jurisdiction of the cause and, if so, whether the report of the Special Master, finding that decedent at the time of his death was domiciled in Massachusetts, should be confirmed.

On March 15, 1937, this Court granted the motion of the State of Texas for leave to file its bill of complaint against the States of Florida and New York and the Commonwealth of Massachusetts, and against decedent's wife, Mabel Harlow Green, and his sister, Hetty Sylvia Ann

Howland Green Wilks, both alleged to be residents of New York. The bill of complaint alleges that Edward H. R. Green died at Lake Placid, New York, on June 8, 1936, leaving surviving him his wife and sister as his only heir and next of kin; that he left a gross estate of approximately $44,348,500, and a net estate valued at $42,348,500, comprising real estate and tangible personal property located in Texas, New York, Florida and Massachusetts, of an aggregate value of approximately $6,500,000, and intangible personal property consisting principally of stocks, bonds and securities, the paper evidences of most of which were located in New York.

The bill of complaint alleges that decedent, at the time of his death, was domiciled in Texas, but that Florida, New York, and Massachusetts each asserts, through its taxing officials, that decedent was at the time of his death domiciled within it. It alleges in detail that Texas and each of the defendant states maintains and enforces a system of taxation upon the inheritance or succession of the estates of decedents domiciled within the state at death, under which laws real estate and tangible personal property located within the state and all intangibles, regardless of their situs, are subjected to the tax; that each of the four states asserts and proposes to exercise the right to tax the estate of decedent on the assumption that decedent was domiciled within it at the time of his death; and that certain judicial proceedings have been instituted in each of the four states for the administration of decedent's estate or some parts of it.[1] It is further alleged that

---

[1] The allegations are that on July 28, 1936, decedent's wife was appointed temporary administratrix of decedent's estate in Texas on an allegation that Green had died intestate and was domiciled at death in Texas; that on August 1, 1936, a proceeding was begun by decedent's sister in the Surrogate's Court of Essex County, New York, for the probate of decedent's will and for her confirmation as the executrix named in the will, in which proceeding she alleged that

none of the four states and no officer or representative of any state, except as already noted, has become a party to any of those proceedings, and that no state or its officer or representative will appear or become a party to any such proceedings instituted in any other state to fix or assess death taxes on decedent's estate, and that no judgment in any such proceeding will be binding on any state not a party to it; that each of the four states claims a lien for taxes and the right to collect a tax, based on decedent's alleged domicile within it, upon the tangibles located in the state and upon all decedent's intangibles wherever located, the total of such claims amounting to a sum far greater than the net value of the estate; that the amount of decedent's property located in Texas is negligible in amount and insufficient to pay its tax; and in the event that the states should obtain adjudications in their own or other courts in pending proceedings, or others instituted for the purpose of collecting the tax on the ground that decedent was domiciled elsewhere than in Texas, Texas would be deprived of its lawful tax. The bill prays that the Court determine whether decedent's domicile,

---

decedent, a non-resident of New York, had died there, leaving personal property located in the state, and in which proceeding a temporary administrator was appointed and decedent's wife and the New York Tax Commissioner entered their appearances; that on August 31, 1936, decedent's wife commenced an action in the United States District Court for northern Texas against decedent's sister to determine the rights of the former in the estate of decedent by reason of an alleged antenuptial agreement which purported to exclude the wife from any interest in decedent's property; that on October 21, 1936, on application of the Massachusetts Commissioner of Corporations and Taxation, a special administrator of the estate of decedent was appointed by a Massachusetts probate court to take possession of and conserve decedent's property in that commonwealth; and that on January 4, 1937, the County Judges' Court of Dade County, Florida, appointed decedent's widow administratrix of the estate of her husband located in Florida.

for purposes of taxation, was in either of the defendant states and that particularly it determine and adjudicate that his domicile was in Texas and that it alone has the right to assess and collect death taxes on decedent's intangibles.

The several defendant states, answering, admit that decedent's estate is insufficient to satisfy the total amount of the taxes claimed. All deny that Green was domiciled in Texas, and by way of counterclaim and cross-bill against the other defendants, each asserts that he was domiciled in it and that it is entitled to collect death taxes upon all of decedent's intangible property and upon all his tangibles within the state. The answer of decedent's wife admitted that he was domiciled in Texas and asserted that by Texas law she owned, as community property, one-half of substantially all of decedent's estate acquired by him after their marriage, free and clear of all death taxes. Pursuant to stipulation showing that she had released all interest in decedent's estate, the suit was dismissed as to her by order of the Court on January 17, 1938. 302 U. S. 662. The answer of defendant Wilks, decedent's sister, denies that Green was domiciled in Texas and asks the Court to determine in which of the defendant states he was domiciled for purposes of taxation.

On June 1, 1937, this Court appointed a Special Master, 301 U. S. 671, to take evidence, to make findings of fact and state conclusions of law, and to submit them to this Court, together with his recommendations for a decree. The Special Master has reported his findings, with certain evidentiary facts, and his finding that decedent at the time of his death was domiciled in the Commonwealth of Massachusetts, this latter conclusion being supported by elaborate subsidiary findings. The case is now before us on exceptions to the Special Master's conclusions of fact and subsidiary findings that decedent's domicile was in Massachusetts at the time of his death.

JURISDICTION.

While the exceptions do not challenge the jurisdiction of the Court, the novel character of the questions presented and the duty which rests upon this Court to see to it that the exercise of its powers be confined within the limits prescribed by the Constitution make it incumbent upon us to inquire of our own motion whether the case is one within its jurisdiction. *Minnesota* v. *Hitchcock,* 185 U. S. 373, 382. By the Judiciary Article of the Constitution, the judicial power extends to controversies between states, and this Court is given original jurisdiction of cases in which a state shall be a party. Art. III, § 2. The present suit is between states, and the other jurisdictional requirements being satisfied, the individual parties whose presence is necessary or proper for the determination of the case or controversy between the states are properly made parties defendant. Cf. *United States* v. *West Virginia,* 295 U. S. 463, 470. So that our constitutional authority to hear the case and grant relief turns on the question whether the issue framed by the pleadings constitutes a justiciable "case" or "controversy" within the meaning of the Constitutional provision, and whether the facts alleged and found afford an adequate basis for relief according to accepted doctrines of the common law or equity systems of jurisprudence, which are guides to decision of cases within the original jurisdiction of this Court. See *Robinson* v. *Campbell,* 3 Wheat. 212, 222, 223; *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 18 How. 460, 462; *Irvine* v. *Marshall,* 20 How. 558, 564, 565; *Payne* v. *Hook,* 7 Wall. 425, 430.

Before the Constitution was adopted a familiar basis for the exercise of the extraordinary powers of courts of equity was the avoidance of the risk of loss ensuing from the demands in separate suits of rival claimants to the same debt or legal duty. *Alnete* v. *Bettam,* Cary, 65 (1560); *Hackett* v. *Webb and Willey,* Finch 257 (1676);

see 9 Viner Abr., 419–440; 1 Spence, The Equitable Jurisdiction of the Court of Chancery, 659; Maclennan, Law of Interpleader, 5 *et seq.* Since, without the interposition of equity, each claimant in pursuing his remedy in an independent suit might succeed and thus subject the debtor or the fund pursued to multiple liability, equity gave a remedy by way of bill of interpleader, upon the prosecution of which it required the rival claimants to litigate in a single suit their ownership of the asserted claim. A plaintiff need not await actual institution of independent suits; it is enough if he shows that conflicting claims are asserted and that the consequent risk of loss is substantial. *Evans* v. *Wright,* 13 W. R. 468; *Michigan Trust Co.* v. *McNamara,* 165 Mich. 200; 130 N. W. 653; *Webster* v. *Hall,* 60 N. H. 7; *Thompson* v. *Ebbets,* Hopk. Ch. 272 (N. Y.); *Dorn* v. *Fox,* 61 N. Y. 264; *Yarborough* v. *Thompson,* 3 Sm. & M. (11 Miss.) 291, 294; 4 Pomeroy, Equity Jurisprudence (4th ed.) §§ 1319–1329, 1458–1482; Maclennan, *supra,* 119.

The peculiarity of the strict bill of interpleader was that the plaintiff asserted no interest in the debt or fund, the amount of which he placed at the disposal of the court and asked that the rival claimants be required to settle in the equity suit the ownership of the claim among themselves. But as the sole ground for equitable relief is the danger of injury because of the risk of multiple suits when the liability is single, *Farley* v. *Blood,* 30 N. H. 354, 361; *Bedell* v. *Hoffman,* 2 Paige 199, 200; *Mohawk & Hudson R. Co.* v. *Clute,* 4 Paige 384, 392; *Atkinson* v. *Manks,* 1 Cowen (N. Y.) 691, 703; Story, Equity Pleadings (10th ed.) §§ 291, 292, and as plaintiffs who are not mere stakeholders may be exposed to that risk, equity extended its jurisdiction to such cases by the bill in the nature of interpleader. The essential of the bill in the nature of interpleader is that it calls upon the court to exercise its jurisdiction to guard against the risks of loss

from the prosecution in independent suits of rival claims where the plaintiff himself claims an interest in the property or fund which is subjected to the risk. The object and ground of the jurisdiction are to guard against the consequent depletion of the fund at the expense of the plaintiff's interest in it and to protect him and the other parties to the suit from the jeopardy resulting from the prosecution of numerous demands, to only one of which the fund is subject. While in point of law or fact only one party is entitled to succeed, there is danger that recovery may be allowed in more than one suit. Equity avoids the danger by requiring the rival claimants to litigate before it the decisive issue, and will not withhold its aid where the plaintiff's interest is either not denied or he does not assert any claim adverse to that of the other parties, other than the single claim, determination of which is decisive of the rights of all. *Pacific National Bank* v. *Mixter,* 124 U. S. 721; *Providence Sav. Life Assur. Soc.* v. *Loeb,* 115 F. 357; *Sherman National Bank* v. *Shubert Theatrical Co.,* 238 F. 225, aff'd, 247 F. 256; *Illingworth* v. *Rowe,* 52 N. J. Eq. 360; 28 A. 456; *Carter* v. *Cryer,* 68 N. J. Eq. 24; 59 A. 233; 2 Story, Equity Jurisprudence (14th ed.) § 1140; Story, Equity Pleadings (10th ed.) § 297b; Chafee, Cases on Equitable Remedies, 75 *et seq.;* 3 Daniell, Chancery Pleading and Practice (6th Amer. Ed.) 1572; Maclennan, *supra,* 338 *et seq.*

When, by appropriate procedure, a court possessing equity powers is in such circumstances asked to prevent the loss which might otherwise result from the independent prosecution of rival but mutually exclusive claims, a justiciable issue is presented for adjudication which, because it is a recognized subject of the equity procedure which we have inherited from England, is a "case" or "controversy," within the meaning of the Constitutional provision; and when the case is one prosecuted between states, which are the rival claimants, and the risk of loss

is shown to be real and substantial, the case is within the original jurisdiction of this Court conferred by the Judiciary Article. See *Nashville, C. & St. L. Ry. Co.* v. *Wallace*, 288 U. S. 249, 261 *et seq.*, and cases cited.

Here it is conceded by the pleadings and upon brief and argument that the sole legal basis asserted by the four states for the imposition of death taxes on decedent's intangibles is his domicile at death in the taxing state. There is no question presented of a situs of decedent's intangibles differing, for tax purposes, from the place of his domicile, such as was considered in *New Orleans* v. *Stempel*, 175 U. S. 309; *Safe Deposit & Trust Co.* v. *Virginia*, 280 U. S. 83; *Beidler* v. *South Carolina Tax Comm'n*, 282 U. S. 1, 8; *First National Bank* v. *Maine*, 284 U. S. 312, 331; *Wheeling Steel Corp.* v. *Fox*, 298 U. S. 193, 210; *First Bank Stock Corp.* v. *Minnesota*, 301 U. S. 234, 237, 238; *Long* v. *Stokes*, 174 Tenn. 1; 118 S. W. 2d 228, probable jurisdiction noted, Nov. 14, 1938; *Graves* v. *Elliott*, 274 N. Y. 10; 8 N. E. 2d 42, certiorari granted November 14, 1938, 305 U. S. 667. And no determination made here as to domicile can hereafter foreclose the determination of such questions by any court of competent jurisdiction in which they may arise. By the law of each state a decedent can have only a single domicile for purposes of death taxes, and determination of the place of domicile of decedent will determine which of the four states is entitled to impose the tax on intangibles so far as they have no situs different from the place of domicile. No relief is sought to restrain collection of the tax or to interfere with the determination of its amount by appropriate state procedure.

The Special Master has found that each of the four states in good faith asserts that the decedent was domiciled within it at his death; that prior to the commencement of these proceedings each state in good faith was preparing to enforce a lien on decedent's intangibles

wherever located and would now be taking appropriate action but for these proceedings; and that the net estate is not sufficient to pay the aggregate amount of the taxes claimed by them and by the federal government.[2] He has

[2] The Special Master has found as follows: The net estate, after payment of debts and administration expenses other than death taxes, will amount to $36,137,335; and the tangible property taxable in the state of its situs is as follows:

| | |
|---|---|
| Texas | $2,220.00 |
| Florida | 222,276.00 |
| New York | 1,583,221.00 |
| Massachusetts | 2,498,707.00 |

Decedent's intangibles at the time of his death had a value of $35,831,303. The paper evidences ·of decedent's intangibles were located outside of the states of Texas, Florida, and Massachusetts. "The aggregate value of the shares of stock in and obligations of corporations and associations organized or having a principal place of business in Texas, Massachusetts and Florida, respectively, and of the obligations of persons residing in said States and of the obligations of said States and political subdivisions thereof, together with the value of the real estate and tangible property in Texas, Massachusetts and Florida, respectively, is less than the amount of the tax claimed by each of said States and the amount of such tax claimed by Texas, Massachusetts and Florida, respectively, greatly exceeds the value of the property subject to the jurisdiction of their respective Courts and from which the tax might be collected in any proceeding in said Courts." The Special Master found that the death taxes due to the United States, and due to each state, if its contentions be sustained, are as follows:

| | |
|---|---|
| United States | $17,520,987 |
| Texas | 4,685,057 |
| Florida | 4,663,857 |
| New York | 5,910,301 |
| Massachusetts | 4,947,008 |
| Total | $37,727,213 |

This exceeds the total net estate by the sum of $1,589,877. In addition the State of New York asserts a claim for unpaid personal income taxes of $920,827.

also found, as averred in the pleadings, that none of the four states has become or will consent to become a party to any proceedings for determining the right to collect the tax in any other state; that the right of Texas to assert its tax lien and to prosecute its claim for taxes with success is in jeopardy and that it is without adequate remedy save in this Court.

The risk that decedent's estate might constitutionally be subjected to conflicting tax assessments in excess of its total value and that the right of complainant or some other state to collect the tax might thus be defeated was a real one, due both to the jurisdictional peculiarities of our dual federal and state judicial systems and to the special circumstances of this case. That two or more states may each constitutionally assess death taxes on a decedent's intangibles upon a judicial determination that the decedent was domiciled within it in proceedings binding upon the representatives of the estate, but to which the other states are not parties, is an established principle of our federal jurisprudence. *Thormann* v. *Frame,* 176 U. S. 350; *Overby* v. *Gordon,* 177 U. S. 214; *Burbank* v. *Ernst,* 232 U. S. 162; *Baker* v. *Baker, Eccles & Co.,* 242 U. S. 394; *Iowa* v. *Slimmer,* 248 U. S. 115, 120, 121; *Worcester County Trust Co.* v. *Riley,* 302 U. S. 292, 299. And a judgment thus obtained is binding on the parties to it and constitutionally entitled to full faith and credit in the courts of every other state. *Milwaukee County* v. *White Co.,* 296 U. S. 268. The equity jurisdiction being founded on avoidance of the risk of loss resulting from the threatened prosecution of multiple claims, the risk must be appraised in the light of the circumstances as they are in good faith alleged and shown to exist at the time when the suit was brought. Cf. *Clark* v. *Wooster,* 119 U. S. 322; *Rice & Adams Corp.* v. *Lathrop,* 278 U. S. 509; Maclennan, *supra,* 132 *et seq.* In this case, as will presently be noted, the relations of decedent to each of the

demanding states were such as to afford substantial basis for the claim that he was domiciled within it, with fair probability that the claim would be accepted and favorably acted upon if there were no participation by the other states in the litigation. See *New Jersey* v. *Pennsylvania,* 287 U. S. 580; *Hill* v. *Martin,* 296 U. S. 393; *Dorrance's Estate,* 309 Pa. 151; 163 A. 303, certiorari denied, 287 U. S. 660, 288 U. S. 617; *In re Dorrance,* 115 N. J. Eq. 268; 170 A. 601; *Dorrance* v. *Martin,* 116 N. J. Law 362; 184 A. 743, certiorari denied, 298 U. S. 678. Cf. *Matter of Trowbridge,* 266 N. Y. 283; 194 N. E. 756. In addition the facts most essential to establishing that attitude and relationship of person to place which constitute domicile were in this case obscured by numerous self-serving statements of decedent as to his domicile, which, because made for the purpose of avoiding liability for state income and personal property taxes levied on the basis of domicile, tended to conceal rather than reveal the true relationship in this case. Taken as a whole the case is exceptional in its circumstances and in the principles of law applicable to them, all uniting to impose a risk of loss upon the state lawfully entitled to collect the tax.

We think that the Special Master's finding of jeopardy is sustained; that a justiciable "case" between the states is presented; and that a cause of action cognizable in equity is alleged and proved. The fact that no relief by way of injunction is sought or is recommended by the Special Master does not militate against this conclusion. While in most causes in equity the principal relief sought is that afforded by injunction, there are others in which the irreparable injury which is the indispensable basis for the exercise of equity powers is prevented by a mere adjudication of rights which is binding on the parties. This has long been the settled practice of this Court in cases of boundary disputes between states. *Louisiana* v. *Mis-*

*sissippi,* 202 U. S. 1; *Arkansas* v. *Tennessee,* 246 U. S. 158; *Georgia* v. *South Carolina,* 257 U. S. 516; *Oklahoma* v. *Texas,* 272 U. S. 21; *Michigan* v. *Wisconsin,* 272 U. S. 398; *New Jersey* v. *Delaware,* 291 U. S. 361. In the case of bills of peace, bills of interpleader and bills in the nature of interpleader, the gist of the relief sought is the avoidance of the burden of unnecessary litigation or the risk of loss by the establishment of multiple liability when only a single obligation is owing. These risks are avoided by adjudication in a single litigation binding on the parties.

While courts of equity in such suits may and frequently do give incidental relief by injunction to secure the full benefits of the adjudication and to terminate the litigation in a single suit, they are not bound to do so and their adjudication of the conflicting claims is not any the less effective as res judicata because not supplemented by injunction. We do not doubt that when the equity powers of the Court have been invoked it has power in its discretion to give such incidental relief by way of injunction as will make its determination the effective means of avoiding risk of loss to any of the parties by reason of the asserted multiple tax liability. But the plenary effect of its decision as res judicata, and considerations of convenience in the levying of the tax by the usual state procedure, make it unnecessary and undesirable that the Court should proceed beyond adjudication. The fact that the Court, for reasons of policy or convenience, does not exercise the power which it possesses and which has been traditionally exercised in like cases between private suitors does not deprive the suit of its character as a case or controversy cognizable by the Court in an original suit. See *Fidelity National Bank & Trust Co.* v. *Swope,* 274 U. S. 123, 132, 133, 134; *Nashville, C. & St. L. Ry.* v. *Wallace, supra.*

DOMICILE.

The Special Master took voluminous testimony in each of the four states, recording every available fact having any bearing on the issue of decedent's domicile. After an exhaustive study of the evidence the Special Master has prepared elaborate subsidiary findings in which he has stated what he considers to be the essential facts of decedent's life which, taken together, were the controlling factors in his arriving at the conclusion that decedent, at the time of his death, was domiciled in the Commonwealth of Massachusetts.

In considering and weighing the evidence the Special Master concluded that there was no local law peculiar to any of the states with respect to the essential fact elements which go to establish domicile, and that the rule in each of the states defining domicile was substantially that of the common law. Texas, since Green in the earlier part of his life lived for a large part of his time in that state and frequently proclaimed it to be his legal residence, places great emphasis on the common law rule that when one has once acquired a domicile in one place he does not lose it by mere residence elsewhere without the intention to make the new place of residence a domicile in the sense of a permanent home. The defendant states, as they were all places in which decedent lived for considerable periods of time during the latter part of his life, and as they were all places with which he then became more intimately associated, place greater emphasis on "home" as the substantial equivalent of domicile as the term is defined in the American Law Institute's Restatement of Conflict of Laws, § 13, where it is said: "A home is a dwelling place of a person, distinguished from other dwelling-places of that person by the intimacy of the relation between the person and the place . . . In

determining whether a dwelling-place is a person's home, consideration should be given to:

"1. Its physical characteristics;

"2. The time he spends therein;

"3. The things he does therein;

"4. The persons and things therein;

"5. His mental attitude towards the place;

"6. His intention when absent to return to the place;

"7. Elements of other dwelling-places of the person concerned."

The Special Master, while not completely adopting either of the tests proposed, nevertheless finds that both support his conclusion. We accept the Special Master's findings of fact and his conclusion that the decedent at the time of his death was domiciled in Massachusetts. As the Master has found and stated in great detail the circumstances of decedent's life which lead to that conclusion, and has made them available in his report, we find it unnecessary to do more than state the salient facts which are typical of and supported by many others, and which support his ultimate conclusion.

Edward Green was born in England August 22, 1868, and was in his sixty-eighth year at the time of his death, June 8, 1936, at Lake Placid, New York, where he was temporarily sojourning for reasons of health. He was the son of Hetty Green, a well-known figure in the financial world, who was born in New Bedford, Massachusetts. Her forebears had resided in that vicinity since the seventeenth century, and Green and his sister Mrs. Wilks inherited from her one hundred and thirty acres of land in the town of Dartmouth, which had been the family home and had been property of the family for some two hundred years. The foundation of the family fortune had been laid in the whaling industry, centering at New Bedford. At her death his mother left an estate of $67,000,000

which, under her will, became the property of decedent and his sister in substantially equal shares.

His education was in the public schools of Vermont and New York, and for two years he attended Fordham University in New York City. His tastes were not artistic or literary; he had a deep interest in scientific study and experimentation, especially in the fields of astronomy, geology, electricity, photography, radio and aviation. He was fond of the sea and of yachting, and until a serious illness in 1921, followed by permanent impairment of his health, he was interested in athletics and outdoor life. After that time he became especially interested in collecting stamps, coins, currency, and jewels, to which he devoted much attention. He had no interest in fashionable or social life, but preferred, as he stated, associating with the common man or "the man in the street."

In 1892, when he was twenty-four years old, his mother sent him to Texas to foreclose a mortgage on a short line of railroad located there, later known as the Texas Midland Railroad. As the result of the foreclosure she acquired the railroad, and for the larger part of Green's time until 1911 he remained in Texas for the purpose of looking after the management of the road. In that year he returned to live in New York at the urgent request of his mother, who, because of failing health, desired his assistance in the management of her business affairs.

From 1911 until 1921 Green customarily made two trips a year to Texas, one to attend the annual meeting of the railroad and the other to inspect the road, and in alternate years to vote in Terrell, Texas, in state and municipal elections. From 1922 to 1927 he made but one annual visit, in the spring of each year. After 1923 he spent only two or three days on each visit to Texas, in Terrell and its vicinity. In the years 1924 to 1927 he visited Marlin, Texas, where he remained for about a month each

year for purposes of medical treatment. In 1928 the rail-
road was sold. After the agreement for sale was made in
1927, he made no other visit to Dallas or Terrell, and his
only visit to Texas was in 1935, for treatment at a clinic
in Marlin.

During the period of his residence in Texas, decedent
was a bachelor and maintained domestic establishments
at various places. He at first lived in a hotel. About
1894 he maintained a bachelor apartment at Terrell. For
a time he also kept rooms at a hotel in Dallas and then
about 1896 or 1897 leased an apartment in that city.
Later he purchased a building there which he remodelled
and occupied as a dwelling until 1911, when the building
was sold. After that he caused a friend to rent a room
for him in Terrell, Texas, admittedly for the purpose of
preserving his right to vote in Texas. The room was
never occupied by him nor were any of his possessions
sent there, except a box containing a pair of trousers and
a vest. He also owned a two hundred acre experimental
farm near Terrell where there were living quarters which
he occasionally used. The farm was afterwards sold, and
from 1911 on he had no dwelling place in Texas except
his private railroad car, which was sold with the road in
1927–1928. Upon his removal to New York in 1911 all
of the best furniture in the Dallas residence was packed
and shipped to New York for use in his dwelling there.
His library of books on scientific subjects was given to the
Dallas Public Library. At the time of his death his only
real property in Texas consisted of some unsaleable lots
pertaining to the railroad which were appraised at $2,200.

During the period of his residence in Texas, aside from
his active interest in the management of the railroad he
became interested in scientific and farm experimentation.
He also became active in Texas politics, was a Texas dele-
gate to the Republican National Convention at St. Louis,
and became Chairman of the Republican State Executive

Committee, serving in that capacity for four years, and upon reëlection until 1900. In 1906 the nomination for Governor of Texas ón the Republican ticket was offered him, but he declined the nomination upon the insistence of his mother. He was appointed a colonel upon the Texas Governor's Staff and served in that capacity until January, 1915. Prior to 1911 and until 1920 he voted in Texas in state and national elections.

Green frequently expressed himself as being attached to the state and to its people. With few exceptions and in substantially all deeds, papers, and legal documents he described himself as of Terrell; Texas, and instructed his secretary and office manager and his attorneys in New York, Massachusetts, and Florida, to mention in all important legal documents that Terrell was his legal residence. He continued this practice until 1935. In his will, executed in 1908, in his application for a marriage license in 1917, and in the probate proceedings connected with his mother's estate, 1916–1918, he was described as of Terrell, Texas. In 1922 he declined to consider running for Congress in Massachusetts because he claimed to be a resident of Texas. In 1929 he stated he would not be available for appointment as Federal Radio Commissioner from New England because he was a former Republican National Committeeman of Texas and spent only the summer months in New England. In 1935 he testified under oath in Florida that his residence was Texas, with a winter home in Florida and a summer home in New Bedford. In that year he returned to the Texas Centennial Committee a certificate which described him as of Massachusetts, with the statement: "I have never changed my legal residence from Terrell, Texas."

If declarations were alone sufficient to establish domicile, the record would leave no doubt that Green was domiciled in Texas until the time of his death. But in this connection it should be noted that Green never paid

'an income tax or a personal property tax on intangibles in any state, and the Special Master was of opinion that the desire to avoid taxation was a controlling motive for Green's repeated declarations that he was a resident of Texas long after he had ceased to have an abiding place or any active connection with affairs in that state.

In July, 1911, Green removed his household belongings to New York City, where he established his dwelling place in a house at 5 West 90th Street, which was owned by the estate of his grandfather and adjoined a house occupied by his mother. He opened an office in New York City, which remained his business headquarters until his death, and with his mother maintained a joint office in her residence. When Green came to New York his mother settled upon him, as his own, property valued at $500,000. Upon her death in 1916 he became entitled to an interest in the estate of his grandfather aggregating $4,500,000, and under the will of his mother he became entitled to the income of one-half of her estate for a period of ten years, when he received one-half of the principal, aggregating about $33,000,000.

Following his mother's death he was married, on July 10, 1917, to Miss Mabel Harlow. The following winter they removed from the 90th Street house to an apartment in the Waldorf Hotel, where they lived when in New York until the hotel was demolished in 1921. Then they removed to the Sherry Netherlands Hotel, where they rented and used a large suite. He at first took a two year lease on the apartment, but from May 1, 1931, the rental was continued on a monthly basis. The apartments were furnished by the hotels; decedent's furniture, pictures, and personal belongings, much of which he had brought from Texas, remained at 5 West 90th Street until 1921, when most of them were removed to decedent's place at Round Hills, Massachusetts. In 1928 the remainder was sent to Round Hills and the New York house demolished.

During the last ten years of his life his apartment in New York was used only as a temporary stopping place on his trips north and south. At his death the family belongings in the apartment consisted of some of his mother's letters, a portion of his stamp collection, his interest in which had been slight since 1927, some clothing of Mrs. Green's, and a few personal belongings worth less than $1,000. His tangible personal property in New York at the time of his death consisted principally of his collection of jewels, coins, currency and stamps, having an aggregate value of $1,583,221.

Green never registered or attempted to vote in New York. In 1916 he was assessed there for personal property taxes, but the assessment was cancelled upon his submission of affidavits declaring that his legal residence was in Texas. To the suggestion of a friend made in 1917 that he build a home on Long Island, he replied that he did not want to do so as he did not wish to pay taxes in New York. And later he stated that he desired to build on his mother's place at Round Hills in Massachusetts. During the period from 1911 to 1921 he was active in business affairs in New York. He managed his own fortune, which amounted to approximately $6,000,000 after his mother's death. He also assisted in managing her extensive business interests and after her death was actively engaged as executor and trustee in looking after her large estate, including several family-owned holding corporations. Decedent became a director of a New York National Bank and a director of two important trust companies and regularly attended their meetings and participated in their affairs until about 1921. He maintained large deposit balances in New York banks; his personal securities were kept in safe deposit vaults there. He did not enjoy New York life and sometimes expressed dislike of its people and business practices. After his illness in November, 1921, all of his activities there ceased.

He never thereafter attended trustees' or directors' meetings, or went to his New York office.

After his marriage in 1917 Green spent a part of the summer near Round Hills, Massachusetts, in the vicinity of Dartmouth, which was the property he had inherited from his mother. On his first visit on a yachting trip in 1917 he determined to develop the property into a large country estate and build there an imposing residence. With that in view and with the consent and approval of his sister he began to develop the property in the fall of that year by clearing the land, constructing breakwaters, wharves, water tanks, pumping plant, greenhouses and workmen's cottages. From then until 1921 development of the property was his principal interest and occupation. While the work was going forward decedent spent much time on his yacht or at a hotel in the vicinity. In July of 1921 the house was ready for occupancy, and from then until shortly before his death he spent more time there almost every year than at any other place, usually coming to Round Hills immediately after July 1st, evidently because taxes were assessed as of that date, and remaining just short of six months each year.

Between 1917 and 1926 Green expended on the Round Hills estate in excess of $6,688,000. To the land inherited from his mother he added by purchase one hundred and forty adjoining acres. The house was large and imposing—indeed, somewhat "institutional" in appearance, there having apparently been some thought, which he never carried out, of converting it into an institution as a memorial to the Green and Howland families after his own and his sister's death. Upon the property were some sixty structures, including the usual outbuildings of a large country estate, swimming pools, tennis courts, radio broadcasting stations, an airport, airship hangar and dock. The house was designed as a commodious residence, with

carefully planned accommodations for family, guests, and for a full complement of servants.

Special furniture was designed for the house, but furnishings from 5 West 90th Street in New York were also brought to it, including family possessions and heirlooms, two oil portraits of his mother, another of his grandfather, personal collections of prints and engravings of whaling ships and scenes, and framed certificates of his membership in various historical societies. Green assembled there a well chosen library of miscellaneous and scientific books, including many rare volumes on the history of New England and accounts of the whaling industry, on which the family fortune had been founded. In a vault in the basement was assembled a substantial part of his collection of jewelry, coins, and stamps.

In the social life of the countryside he took no part, but he associated freely with employees and tradesmen and visitors interested in scientific research. He developed on a large scale his interest in various scientific activities, especially photography, radio, and aviation. A number of his buildings and radio facilities were placed at 'the disposal of the Massachusetts Institute of Technology for experimental purposes, and he contributed his own funds to the cost of experiments. On his property he established an airport and a school for aviators. He arranged to have the "Charles W. Morgan," an old whaling ship, transferred to Whaling Enshrined, Inc., to which he gave a strip of the shore at Round Hills where he established the vessel and maintained it as a museum which he kept open to the public. His grounds and bathing beach were also opened to the public, members of which visited them in large numbers.

Owing to his failing health most of these activities, though not his interest in them, were curtailed during the last three years of his life, but he continued to spend most

of the summer and the early fall at Round Hills until the year of his death, and all of his personal and intimate belongings remained there. He told a friend that he hoped to be there when he died; and his remains were brought there from Lake Placid for the funeral service. Green never voted in Massachusetts or openly acknowledged Round Hills as his legal residence, invariably giving as his reason that he wished to avoid paying taxes there. When a demand was made upon him by Massachusetts officials for payment of income tax in 1928, he declined to file a return on the ground that his legal residence was Terrell, Texas. No income or personal property tax on intangibles was paid by him in Massachusetts.

In 1923 he was advised by his physician, following an operation and illness, to go to Florida. He spent the following winter there in hotels or upon boats in the vicinity of Miami and Jacksonville. In April, 1924, he bought land on Star Island, near Miami Beach, and began landscaping work and construction of a dock. In January, 1925, he returned to Miami Beach, living on a houseboat near Star Island for about three and a half months. While there he purchased additional lots and began the construction of a dwelling.

Part of the following winter was spent on his houseboat near Star Island, and the house was finally completed and occupied as a winter residence in 1927. In the following years, until his death, he spent about four and a half months each winter at Star Island, between January and May. The house, costing over $600,000, was fully equipped as a winter residence, with ample accommodations for family, guests, and servants. His total expenditures there amounted to about $1,500,000. The house was furnished with new specially made furniture, and it contained, with negligible exceptions, no pictures, books, furniture, or mementos of intimate personal or family association. As in his other places of residence, he took

little part in the social life of the community. In Florida he never carried on any of the activities or experiments with which he had occupied himself in Texas or Massachusetts. His life in Florida was typical, on the whole, of a semi-invalid seeking health there during the winter months. He busied himself for the most part with automobile rides, cruising in nearby waters, and in working on his collections, parts of which he had brought with him from Massachusetts.

Green occasionally spoke to friends of Florida as his home, saying to one: "This is my home and I expect to live here the rest of my days." He never voted in Florida or paid intangible property taxes there, although subject to such taxes if a resident; in 1933 he declared to the local tax assessor that his legal residence was in another state. In 1931 and again in 1933 he was advised by a friend to change his legal residence from Texas to Florida because of pending tax legislation in Texas. His attorney suggested that as he had a residence in Florida it would only be necessary to make announcement of his intention. But he took no such action and in March of 1935 testified in a judicial proceeding in Florida that Texas was his legal residence.

The four persons nearest to decedent in life, his wife, his sister, his office manager, and his secretary, were able to throw little light on his purposes and intention with respect to his domicile. Mrs. Green, who was a party to the present suit, asserted by her answer that Texas was the domicile of herself and her husband. After settlement with Mrs. Wilks, the sister, of her claims upon the estate, the suit was discontinued as to Mrs. Green. There is nothing in the record to indicate that she has since claimed or resumed her domicile in Texas. On the contrary, she remained at Round Hills for six months after Green's death. The Special Master concluded that her position with reference to her husband's domicile was in-

fluenced by the advantages which might accrue to her from the community property laws of Texas. The sister, by her answer in this case as well as in the New York proceeding where she claimed under her brother's will, in which he declared Texas to be his legal residence, denied that her brother was a resident of Texas, and in this proceeding she asserts that his domicile at the time of his death was in Massachusetts. Neither his wife nor his sister has given any evidence to explain the inconsistency between Green's declarations and his actions or the conflict between themselves upon the issue of domicile. All decedent's books and papers were made available by his office manager, who testified that from the inception of their business association in New York until decedent's death, he claimed Texas as his legal residence and gave instructions that in all formal documents his permanent residence be stated as Texas. His secretary testified to the same effect. Neither was able to give any intimation of the real intention behind decedent's declarations and actions except what may be inferred from his evident desire and frequently announced purpose to escape or minimize taxes.

Residence in fact, coupled with the purpose to make the place of residence one's home, are the essential elements of domicile. *Mitchell* v. *United States*, 21 Wall. 350; *Pannill* v. *Roanoke Times Co.*, 252 F. 910; *Beekman* v. *Beekman*, 53 Fla. 858; 43 So. 923; *Babcock* v. *Slater*, 212 Mass. 434; 99 N. E. 173; *Matter of Newcomb*, 192 N. Y. 238; 84 N. E. 950; Beale, Conflict of Laws, § 15.2. We conclude, as the Special Master found, that Green ceased to have a place of residence in Texas after 1911. About 1914 he gave up his nominal place of abode in the room which he had rented in Terrell, Texas, and which in fact he had never occupied. After that he was never identified in fact with any place of residence in Texas, and there was

nothing in his life to connect him with a Texas home other than his frequent statements that his legal residence was in Texas. While one's statements may supply evidence of the intention requisite to establish domicile at a given place of residence, they cannot supply the fact of residence here; *Matter of Newcomb, supra,* 250; *Matter of Trowbridge,* 266 N. Y. 283, 292; 194 N. E. 756; and they are of slight weight when they conflict with the fact. *Feehan* v. *Tax Comm'r,* 237 Mass. 169, 171; 129 N. E. 292; *Dorrance's Estate,* 309 Pa. 151; 163 A. 303. This is the more so where, as here, decedent's declarations are shown to have been inspired by the desire to establish a nominal residence for tax purposes, different from his actual residence in fact. *Thayer* v. *Boston,* 124 Mass. 132; *Feehan* v. *Tax Comm'r, supra; Matter of Trowbridge, supra;* Beale, *supra,* § 41C. In such circumstances the actual fact as to the place of residence and decedent's real attitude and intention with respect to it as disclosed by his entire course of conduct are the controlling factors in ascertaining his domicile. *Thayer* v. *Boston, supra.* When one intends the facts to which the law attaches consequences, he must abide the consequences whether intended or not.' *National City Bank* v. *Hotchkiss,* 231 U. S. 50, 56; *Dickinson* v. *Brookline,* 181 Mass. 195, 196; 63 N. E. 331.

Whatever floating intention Green may have had after 1911 to return to Texas and to make his home there, it is plain that it receded into the background after his mother's death and had completely vanished when he began to build up his extensive estate at Round Hills in Massachusetts. When he had established himself there all the circumstances of his life indicated that his real attitude and intention with respect to his residence there were to make it his principal home or abiding place to the exclusion of others. This is clearly indicated by the fact

that it was the place most associated with his family history, by the scale on which he built, by his assembling there the furnishings and objects closely associated with his earlier homes and with his family life, and by centering there all the activities related to his chief interests—his mechanical and scientific experiments, his development of radio and aviation, and his efforts to preserve records and mementos of the whaling industry with which his mother's family had been associated. He spent more time there than at any other place, evidently curtailing his stays only to avoid the possible danger of being subjected to Massachusetts taxation. His conception of legal residence or domicile as a mental state whereby he could obtain certain political advantages and freedom from taxation does not weigh against this conclusion. He could not elect to make his home in one place in point of interest and attachment and for the general purposes of life, and in another, where he in fact had no residence, for the purpose of taxation. *Feehan* v. *Tax Comm'r, supra,* 171; 129 N. E. 292; *Matter of Trowbridge, supra.*

There is little to support the contention that Green ever intended to make his permanent home in New York. The exigencies of caring for his mother and her property and of managing her estate after her death demanded his presence there. But apart from these demands life there gave him no opportunity to gratify his special tastes and interests. The nearest semblance to a home there, 5 West 90th Street, was abandoned when he removed its furnishings to Round Hills. After that New York saw little of him, and there was little in his life to suggest that he treated it or in his own mind regarded it as his real home or abiding place. Whatever his purpose may have been before that time, after the occupancy of the Round Hills residence the physical facts of residence united with the major interests of his life to fix upon that as his place

of domicile. *Gilbert* v. *David,* 235 U. S. 561, 570. In point of fact and purpose it became his "preëminent headquarters," which is the essence of technical domicile. *Williamson* v. *Osenton,* 232 U. S. 619, 625.

The retention of his apartment at the Sherry Netherlands Hotel in New York, upon temporary lease, and his occupation of it during the later years of his life for short stays when passing through New York on his way to and from Florida, are without weight to turn the scales against the preponderating evidence that his real home was in Massachusetts. From 1921 on the New York apartment furnished none of the physical aspects of a home, and evidence is wanting that the deceased ever regarded or treated it as such.

Proof is wanting also that the domicile established in Massachusetts was abandoned in favor of the Florida house which he built there in 1927. Florida argues the superior attractiveness and merits of that state for purposes of a home over the more austere environment of Round Hills, but there is little in the record to suggest that such an appeal was persuasive to decedent or that Round Hills had ceased to be what it became when he established himself there—first in his interest and attachment. In such circumstances Florida carries the burden of showing that the earlier domicile was abandoned in favor of a later one. *Mitchell* v. *United States, supra,* 352; *Anderson* v. *Watt,* 138 U. S. 694, 706; *Matter of Newcomb, supra,* 250; Beale, *supra,* § 41A. That burden is not sustained by showing a period of winter residence there in obedience to the demands of health, in the absence there of the activities associated with decedent's chief interests and of the objects of those interests and of intimate family association, with which he had surrounded himself at Round Hills.

The report of the Special Master is confirmed. The substance of the Special Master's recommendation for a

decree will be adopted and the parties may submit a proposed form of decree.

<em>So Ordered.</em>

Opinion of MR. JUSTICE FRANKFURTER.

The authority which the Constitution has committed to this Court over "Controversies between two or more States," serves important ends in the working of our federalism. But there are practical limits to the efficacy of the adjudicatory process in the adjustment of interstate controversies. The limitations of litigation—its episodic character, its necessarily restricted scope of inquiry, its confined regard for considerations of policy, its dependence on the contingencies of a particular record, and other circumscribing factors—often denature and even mutilate the actualities of a problem and thereby render the litigious process unsuited for its solution. Considerations such as these have from time to time led this Court or some of its most distinguished members either to deprecate resort to this Court by states for settlement of their controversies (see *New York* v. *New Jersey*, 256 U. S. 296, 313), or to oppose assumption of jurisdiction (see Mr. Chief Justice Taney in *Pennsylvania* v. *Wheeling Bridge Co.*, 13 How. 518, 579, 592, in connection with the Act of August 31, 1852 (10 Stat. 112), and *Pennsylvania* v. *Wheeling Bridge Co.*, 18 How. 421; Mr. Justice Brandeis in *Pennsylvania* v. *West Virginia*, 262 U. S. 553, 605).[1]

The presupposition of jurisdiction in this case is the common law doctrine of a single domiciliary status. That

---

[1] The spirit in which interstate litigation should be approached has been thus expressed by Mr. Chief Justice Fuller in *Louisiana* v. *Texas*, 176 U. S. 1, 15: "But it is apparent that the jurisdiction is of so delicate and grave a character that it was not contemplated that it would be exercised save when the necessity was absolute and the matter in itself properly justiciable."

for purposes of legal rights and liabilities a person must have one domicile, and can have only one, is an historic rule of the common law and justified by much good sense. Nevertheless, it often represents a fiction. Certainly in many situations the determination of a man's domicile is by no means the establishment of an event or a fact that exists in nature. Even assuming that there is general agreement as to the elements which in combination constitute domicile, a slight shift of emphasis in applying the formula produces contradictory results. But, on the whole, the doctrine of domicile has adequately served as a practical working rule in the simpler societies out of which it arose. More particularly, its difficulties of application were circumscribed when wealth predominantly consisted of realty and tangibles, and when restricted modes of transportation and communication conditioned fixity of residence. In view of the enormous extent to which intangibles now constitute wealth, and the increasing mobility of men, particularly men of substance, the necessity of a single headquarters for all legal purposes, particularly for purposes of taxation, tends to be a less and less useful fiction. In the setting of modern circumstances, the inflexible doctrine of domicile—one man, one home—is in danger of becoming a social anachronism. Recent applications and modifications of this rule to satisfy the vague contours of the due process clause have hardly mitigated its inadequacies for our day. *E. g., Frick* v. *Pennsylvania,* 268 U. S. 473; *Blodgett* v. *Silberman,* 277 U. S. 1; *Farmers Loan & Trust Co.* v. *Minnesota,* 280 U. S. 204; *First National Bank* v. *Maine,* 284 U. S. 312.

The facts in this case doubtless present a bizarre story. But in Green's peregrinations from state to state, in the multiplicity of his residences, and in the conflicting appeals which various states made upon his interests from

·time to time, the case is hardly unique nor are analogues to it unlikely to appear in the future. As a result, this Court is asked to determine the conflicting claims of different states of the Union to a share of the estate of individuals who, as a matter of hard fact, at different periods and contemporaneously invoked and enjoyed such benefits as the existence of state governments confer. It is asked to do so by applying an old doctrine of limited validity to modern circumstances whereby, through the elusive search for an often non-existent fact called domicile, only one state to the exclusion of all others would be allowed to levy a tax. The inherent difficulties of this problem have been widely recognized.[2] The old formulas are simply inadequate to the new situation. On the other hand, it is not for this Court in these cases of multiple residences to evolve new taxing policies based on more equitable considerations than the all-or-nothing consequence of the old domiciliary rule.

I am not unaware of the dilemma presented by such a situation as the Dorrance litigation.[3] The circumstances attending the Green estate do not preclude like possibilities. But merely because no other means than litigation have as yet been evolved to adjust the conflicting

---

[2] INTERSTATE COMMISSION ON CONFLICTING TAXATION, CONFLICTING TAXATION (1935) 88 et seq.; compare League of Nations Documents, E. F. S. 16 A. 16. 1921; E. F. S. 73 F. 19. 1923; C. 368. M. 115. 1925. II; C. 216. M. 85. 1927. II; C. 345. M. 102. 1928. II; C. 562. M. 178. 1928. II; C. 345. M. 134. 1929. II; C. 585. M. 263. 1930. II; C. 791. M. 385. 1931. IIA; C. 618. M. 291. 1933. IIA; C. 118. M. 57. 1936. IIA.

[3] In re Dorrance's Estate, 309 Pa. 151, 163 Atl. 303, cert. denied, sub nom., Dorrance v. Pennsylvania, 287 U. S. 660, 288 U. S. 617; New Jersey v. Pennsylvania, 287 U. S. 580; In re Dorrance, 113 N. J. Eq. 266, 166 Atl. 177; 115 N. J. Eq. 268, 170 Atl. 601; 116 N. J. Eq. 204, 172 Atl. 503, aff'd sub nom., Dorrance v. Martin, 13 N. J. Misc. 168, 176 Atl. 902, aff'd, 116 N. J. L. 362, 184 Atl. 743, cert. denied, 298 U. S. 678; Hill v. Martin, 296 U. S. 393.

claims of several states in a single estate is not sufficient reason for utilizing as a basis of our jurisdiction oversimplified formulas of the past that have largely lost their relevance in the contemporary context.

The controlling assumption in taking jurisdiction in this case is that the ascertainment of a single domicile for Green is merely the determination of a fact. The auxiliary assumption is the existence of solid danger that the highest courts of four states will ascertain this fact in four different ways. Texas has no standing here except on the basis that three state courts will despoil her of her rights by leaving no assets in the estate out of which to satisfy her claim. But the fact that the political officers of four states make claims to an estate so as to safeguard any possible interest, is hardly a substantial reason for assuming that their judiciaries will sanction the claims.

It is not to be assumed that the state courts will make findings dictated solely by fiscal advantages to their states. The contrary assumption must be made—and the assumption rests on adjudicated experience, e. g., *Matter of Trowbridge*, 266 N. Y. 283; 194 N. E. 756. To the extent that there is danger that out of the same events four state courts will spell four different domiciles, it is inherent in the search for a domiciliary status. The result is arrived at not through ascertainment of an external fact but by attributions made as a matter of law to satisfy the supposed abstract legal requirement of a single domicile no matter what the actualities of human behavior may be. Even a small change of portions in the admixture of factors which in combination yield the legal concept of domicile, may place the domicile in one state rather than another and, thereby, give estate duties to this state rather than that. But the state treasuries are not alone under powerful motives to exploit the doctrine of domicile. The tax systems of different states have varying degrees of attraction for those in control of an estate, and it is to

their natural interest to seek a single, inclusive disposition of the elusive issue of domicile by having the original jurisdiction of this Court invoked.

It is hardly an answer that this Court can protect itself against feigned controversies. The difficulty is that in these modern multiple residence situations the issue of domicile is too often an inherently feigned issue. Two state courts can very legitimately find two different domiciles, in that two equally competent tribunals utilizing the same outward facts in the alembic of the same common law concept of domicile may easily distil contradictory conclusions. Merely to avoid such a conflict is not enough to give jurisdiction.[4] The variant that this case presents is the allegation that if the claims of all four states prevail the estate would be more than eaten up and Texas would lose her potential right. This added requirement—the absorption of the entire estate by having numerous states stake out claims—is too readily supplied.

To extend the neat procedural device of interpleader to such a situation is another illustration of transferring a remedy from one legal environment to circumstances qualitatively different. To settle the interests of different claimants to a single *res* where these interests turn on narrow and relatively few facts and where conflicting claims cannot have equal validity in experience, is one thing; it is a wholly different thing to bring into court

---

[4] The principle is thus formulated in the present case: "That two or more states may each constitutionally assess death taxes on a decedent's intangibles upon a judicial determination that the decedent was domiciled within it in proceedings binding upon the representatives of the estate, but to which the other states are not parties, is an established principle of our federal jurisprudence." *Ante*, p. 410.

The decision of the Court therefore binds the states upon an issue of state law which this Court could not consider upon appeal from the state courts, and on which this Court would be bound to follow state law in all other proceedings instituted in the federal courts.

in a single suit all states which even remotely might assert domiciliary claims against a decedent and where one state court might with as much reason as another find domicile within its state. Certainly when the claim of the moving state is so obviously without basis as this Court has now found in the case of Texas, the linchpin of jurisdiction is gone and the other states should be remitted to appropriate remedies outside this Court. Such a disposition would be a real safeguard against the construction of a suit to give this Court jurisdiction over matters which as such, this Court has already held, are not within our province.[5] To find that the decedent could not, on self-serving grounds, elect to make his home in Texas "where he in fact had no residence" and yet to retain the bill and dispose of it on its merits amounts, in effect, to a declaration of rights on behalf of the estate which could not be adjudicated otherwise than through the screen of a controversy between states.

In this case we do not even have substantial translation into effective legal action of the assertions by the four states of their domiciliary claims. To be sure, the Master has found, as summarized in the Court's opinion, "that each of the four states in good faith asserts that the decedent was domiciled within it at his death." This is a natural attitude of prudence on the part of law officers of states in the case of decedents who had scattered their lives as well as their holdings. But to give this Court the extraordinary jurisdiction which is invoked, there ought to be more than these caveats. There should be manifestation of that hard determination to press a state's claim which is implied in setting the tax-collecting machinery of a state in motion. Allegation, affirmative proof, and finding of such attempts by the various states are lacking. And New York denies without contradic-

---

[5] See note 4, *supra*.

tion that its procedure for tax levy and collection has been set in operation.[6] These circumstances are, therefore, not comparable to the issues in a conventional interpleader suit brought to forestall conflicting actions. Initiation of litigation is, of course, not a prerequisite to an ordinary interpleader. This only serves to emphasize the inappropriateness of utilizing a remedy invented to settle private controversies of limited scope to the resolution of conflicting governmental interests.

Jurisdictional doubts inevitably lose force once leave has been given to file a bill, a master has been appointed, long hearings have been held, and a weighty report has been submitted. And so, were this the last as well as the first assumption of jurisdiction by this Court of a controversy like the present, even serious doubts about it might well go unexpressed. But if experience is any guide, the present decision will give momentum to kindred litigation and reliance upon it beyond the scope of the special facts of this case. To be sure, the Court's opinion endeavors to circumscribe carefully the bounds of jurisdiction now exercised. But legal doctrines have, in an odd kind of way, the faculty of self-generating extension. Therefore, in pricking out the lines of future development of what is new doctrine, the importance of these issues, may make it not inappropriate to indicate difficulties which I have not been able to overcome and

---

[6] "As yet, no one of the States has assessed and levied any death tax against the estate, and, if the matter were left to the ordinary procedure for the assessment of such taxes in the various States, it is highly improbable that determinations would be made in all of the States that Green was domiciled therein. In New York State, the only administrative official who has authority to determine whether or not the estate tax is assessable on the theory that Green was a resident of the State is the Surrogate of one of the counties and thus far no Surrogate has acted in this respect." Brief for the State of New York, p. 2.

potential abuses to which the doctrine is not unlikely to give rise.

I am authorized to say that MR. JUSTICE BLACK concurs in these views and in the conclusion that the bill should be dismissed.

On May 15, 1939, the following decree was entered in the above-entitled case:

### DECREE.

This cause came on to be heard on the pleadings, evidence, and the exceptions filed by the parties to the Report of the Special Master, and was argued by counsel.

The Court having dismissed Mabel Harlow Green as a party defendant to the suit on January 17, 1938 (302 U. S. 662), pursuant to the stipulation filed by the parties, it is now here ordered, adjudged and decreed as follows:

1. The Report of the Special Master is confirmed.

2. The domicile of Edward Howland Robinson Green at the time of his death, June 8, 1936, was in fact and in law within the Commonwealth of Massachusetts and not within the State of Texas, the State of Florida, or the State of New York.

3. The cause will be retained upon the docket for such further action as may be necessary and proper and the parties or any of them may at any time hereafter apply for relief as they may be advised.

And it is further ordered that the costs in this case, including the compensation and expenses of the Special Master shall be paid one-fifth each by the State of Texas, State of Florida, State of New York, Commonwealth of Massachusetts, and Hetty Sylvia Ann Howland Green Wilks.