CENTURY INS. CO., Limited, v. FIRST NAT. BANK OF HUGHES SPRINGS, TEX.

No. 10248.

Circuit Court of Appeals, Fifth Circuit.

Feb. 17, 1943.

Rehearing Denied March 11, 1943.

790

Gaius G. Gannon, of Houston, Tex., for appellant.

Hugh Carney and Howard A. Carney, both of Atlanta, Tex., for appellee.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

HOLMES, Circuit Judge.

This appeal is from a judgment for appellee upon two policies of fire insurance on 2438 bales of cotton pledged to appellee to secure a loan of money. Both policies were taken out by the bank as additional insurance, the cotton being primarily insured by the owner of the warehouse in which it was stored.

In event of the destruction of the cotton by fire, one of the policies sued on (known as the difference-in-value policy) bound appellant to pay the bank the difference between the loan value plus accrued charges and interest and the actual market value, where lower, of the cotton pledged as security. The other (known as the errors-and-omissions policy) insured the bank against damage by fire to the insured's interest in the cotton resulting from "errors and/or omissions" in effecting sufficient specific insurance.

The appellant contends that both of said policies are invalid because appellee took out other insurance with the Hartford Fire Insurance Company covering the same property. We think this defense is without merit, since the letter of October 5, 1937, written by appellee to the Commodity Credit Corporation, did not complete a contract of insurance with the Hartford Company, but merely requested information regarding insurance that the writer desired to obtain. No other attack is made upon the validity of said policies, and the remaining issues relate solely to the method of arriving at the amount due appellee by appellant.

On October 7, 1937, a fire occurred which destroyed the above 2,438 bales and other cotton in the same warehouse, aggregating about 4,000 bales. The warehouseman held a policy of insurance that covered all of the cotton stored in the building burned. This policy on its face was for $125,000 less the amount of unpaid premiums due thereon. The policy was for the protection of the warehouseman's interest in the cotton as well as that of all owners and pledgees thereof. The warehouseman's interest was a lien thereon to secure accrued charges, which admittedly amounted to $723.82 at the time of the fire. The bank also had a lien on the cotton for its debt, which was subordinate to the warehouseman's lien. When the cotton was destroyed the liens thereon, by operation of law, were transferred to the insurance proceeds and the bank's lien remained subordinate to that of the warehouseman. We so held in a prior case involving this same fund.[1] Nevertheless, it indisputably appears that the trustee in bankruptcy was not paid

---

[1] Century Insurance Company v. First Nat. Bank, 5 Cir., 102 F.2d 726, 728, holding that the interest of the bank did not pass to the trustee in bankruptcy. We held further therein as follows: "Only the claim of the bailee for charges as warehouseman so passed, and equity will treat the lien for such charges as transferred from the cotton which was destroyed to the proceeds of insurance deposited in court. To this extent only, the trustee was entitled to enforce his claim for charges which had accrued to the warehouseman at the time of the fire."

the warehouse charges out of said fund, and that no part of the trustee's interest in the fund was distributed to the bank.

The insurer admits that the warehouse charges have not been paid, and argues that they cannot be recovered in this suit. The argument would have the insurer escape payment of this item altogether, although expressly covered by the difference-in-value policy. It does not appear why the trustee was not permitted to recover the warehouse charges in the suit on the primary policy, but it does appear that in distributing the primary insurance fund there was deducted from the payment otherwise due appellee an amount in excess of the total of these charges. Of course there may be only one recovery of this item, but there has been none at this time. It is not a prequisite to recovery that the charges should have been paid by any one. The important thing is that the insurer, which is expressly liable for them, has not paid them. The difference-in-value policy insured against the difference between two sums, the greater of which included accrued warehouse charges. In other words, warehouse charges, like loan value and interest, were elements in the measure of damages when the cotton was lower in value at the time of the fire than the sum of said elements.

The prior suit is res judicata as to the interest of the parties in the interpleader fund and as to the liability of the appellant upon the primary policy, but not as to the amounts due upon the policies sued on in this case. These policies provide new kinds of insurance, unknown to the business world before the adoption of the crop-loan program afforded by the Commodity Credit Corporation. They were devised to protect a federal lending agency, such as the appellee, against loss by fire when the warehouseman had failed to keep the cotton insured for its full market value, and when its market value was lower than the loan value plus accrued interest and charges. The validity of insurance upon property for more than its market value is sustained by the fact that the insured was guaranteed, within a given time, that so long as the loan remained secured by the warehouse receipts, and the cotton was in existence, the paper evidencing the loan would be purchased at face value plus 4% interest (less a small fee) by the Commodity Credit Corporation, an agency of the federal government.

The appellee, First National Bank of Hughes Springs, made loans to cotton producers in accordance with instructions issued by Commodity Credit Corporation, and on notes and pledge forms approved by said corporation. From the time of making the loans to the farmers until the time of the fire, the bank retained title to the notes evidencing the loans, which were secured by pledges of the warehouse receipts. These pledges were called insured negotiable warehouse receipts because the warehouseman was required to certify that the cotton covered by his receipt was insured against loss or damage by fire for the full market value and would be kept insured so long as the receipt remained outstanding.

Under the C. C. C. plan of loans to producers, the borrowers were not personally liable for any deficiency upon the sale of the thing pledged; and, as the Commodity Credit Corporation did not purchase paper after injury to or destruction of the property pledged, it is apparent that the appellee, while it retained title to the producers' notes, was subject to two distinct risks of loss by fire of the cotton pledged to it: (1) The failure of the warehouseman to provide adequate insurance; (2) inability to recoup the difference between market value (where lower) and loan value plus interest and charges by selling its paper to the Commodity Credit Corporation. As the market value at the time of the fire was lower than its loan value, plus interest and charges, the cotton was worth more to appellee than it was to any one else, because if the cotton remained in existence the bank could recoup its debt in full by transferring it to the Commodity Credit Corporation. The cotton therefore had a special value to appellee, which it sought to protect by the policies in suit.

In these circumstances, the appellant's efforts to escape liability must fail, because the policies in suit supplemented the primary policy and each other and were issued by the same insurer. We agree with appellant that none of the policies provided indemnity against the warehouseman's insolvency; and nothing has been awarded on that account.

The rights of the parties must be determined as of the date of the fire. At that time the appellee was protected from loss of its debt, interest, and the warehouse charges by three valid policies of insurance, all issued by appellant: the

warehouseman's blanket policy, now admittedly insufficient; the difference-in-value policy, which insured the debt, interest, and warehouse charges, where the market value was lower, as it admittedly was; and the errors-and-omissions policy, which insured the bank against loss on its mortgage interest (including principal, accrued interest, and accumulated charges) due to errors and omissions of the warehouseman in effecting sufficient specific insurance. The insurer being the same in all three policies, and being solvent, the bank's interests were fully protected; but litigation ensued or was threatened, and the warehouseman filed a petition in bankruptcy.

In an action involving the validity of an endorsement increasing the amount of the primary insurance, the appellant interposed a plea in the nature of a bill of interpleader, and paid into court the amount admittedly due by it under said policy. The costs of this procedure depleted in proportion to its interest the proceeds of primary insurance ultimately paid to appellee. For instance, the Clerk of the Court deducted $1,232.01 as his fee for receiving the money from the insurance company and paying it out in pursuance of an order of court. 28 U.S.C.A. 555, subd. 8. Then a special master was allowed $1,200 for services in distributing the fund to the beneficial owners of the cotton, and attorneys for the special master were allowed $770 for legal services and expenses.

■ These costs were incurred as a result of the insurance company's interposing an equitable plea as a defense in an action at law. This was before the Federal Rules of Civil Procedure became effective, 28 U.S.C.A. following section 723c. The company was not a disinterested stakeholder, and was not entitled to recover costs paid by it in the interpleader proceeding. We so held as to attorneys' fees in this court in the prior case involving this same fund.[2] The principle applies with equal force to the above items of costs in the district court. The clerk's fees were incurred as soon as the fund was paid into court. The special master's fee was allowed as costs in the same proceeding, and was an expensive method of distributing the fund caused by an interpleader being used as a defense in an adversary proceeding when there was no real contest over the fund. The only controversy in that case was as to the validity of the endorsement increasing the primary insurance. The company was in no danger of having to pay the same debt twice. There was no real and substantial risk of actual loss from rival claimants.[3] The contention is made that the appellant caused a part of the primary insurance money to be used to pay its own debt, and may not profit from its own wrong; but the asserted error cannot be corrected on this appeal, the items not being covered by either of the policies in suit.

■ While in the prior suit the defendant had the right to file an equitable plea in defense of the action at law against it, the plea filed did not contain any defense not available at law. Its sole purpose seems to have been to stop interest on the admitted portion of the debt.[4] This purpose was accomplished as to the primary policy; but, although appellant and appellee were the sole parties to that action when this plea was filed, and although

[2] Century Ins. Co. v. First National Bank, 5 Cir., 102 F.2d 726.

[3] State of Texas v. State of Florida, 306 U.S. 398, 407, 59 S.Ct. 563, 568, 830, 83 L. Ed. 817, 825, 121 A.L.R. 1179.

[4] Allowance of interest on the difference-in-value policy was correctly computed through October 25, 1941. It appears, however, that the judgment below allowed interest on the admitted portion of the debt up until such time as the money was actually paid to the bank by the Special Master. The amount allowed was computed as follows:

| | |
|---|---|
| Difference-in-value-policy | $21,195.58 |
| 6% interest from December 3, 1937, to October 25, 1941 | 4,951.03 |
| | $26,146.61 |
| Errors-and-omissions policy | $17,725.66 |
| 6% interest on $92,581.35 from Dec. 3, 1937, to June 13, 1938 | 2,891.58 |
| 6% interest on $28,201.24 from June 13, 1938, to June 8, 1940 | 3,360.97 |
| 6% interest on $17,725.66 from June 8, 1940, to October 25, 1941 | 1,471.47 |
| | $25,449.68 |
| | $51,596.29 |

the appellant owed the bank enough on all three policies to cover the bank's debt, interest, and warehouse charges, it failed to tender anything on the other two policies, liability as to which arose out of the same fire. Payment into court in an adversary proceeding of the full amount due under the primary policy did not stop the running of interest on the other two policies as to which no payment or tender was made. Therefore, interest at the rate of 6% per annum continued to run on the amounts due under the policies now in suit from December 3, 1937, until the judgment was entered herein in the lower court on November 24, 1941. As to the difference-in-value policy, the judgment will be corrected to include interest to November 24, 1941. As to the errors-and-omissions policy, the judgment will be corrected to allow recovery of $13,652.95 plus interest at 6% from December 3, 1937, to November 24, 1941.[5] The corrected judgment will, of course, bear interest from its date until paid.

The judgment as modified, with all costs assessed against appellant, is affirmed.

---

[5] As corrected, the recovery plus interest up to date of the entry of judgment will be as follows:

| | | |
|---|---|---|
| Difference-in-value-policy | $21,195.58 | |
| 6% interest to November 24, 1941 | 5,055.17 | |
| | | $26,250.75 |
| Errors-and-omissions policy | $13,652.95 | |
| 6% interest to November 24, 1941 | 3,253.96 | |
| | | $16,906.91 |
| Total | | $43,157.46 |