COCA-COLA INTERNATIONAL CORPORATION, a corporation of the State of Delaware,

<em>vs.</em>

THE NEW YORK TRUST COMPANY, a corporation of the State of New York, as Temorpary Administrator of the Estate of Julia M. Hungerford, Deceased, and JULIAN RILEY and HUGHES SPALDING, as Executors of the Estate of Julia M. Hungerford, Deceased,

Defendants,

THE NEW YORK TRUST COMPANY, a corporation of the State of New York, as Administrator *c. t. a.* of Julia M. Hungerford, deceased,

Intervening Defendant.

<em>New Castle, Sept.</em> 20, 1939.

*Robert H. Richards* and *Aaron Finger,* of the firm of Richards, Layton & Finger, and *Dan MacDonald* and *James A. Branch,* both of Atlanta, Ga., for Julian Riley and Hughes Spalding, Executors of the Estate of Julia M. Hungerford, deceased.

*Clarence A. Southerland,* of the firm of Ward & Gray, and *Daniel O. Hastings,* of the firm of Hastings, Stockly,

Duffy & Layton, and *John S. Wise,* of New York City (*Marion Smith,* of Atlanta, Ga., of counsel), for the New York Trust Company, Administrator *c. t. a.* of the Estate of Julia M. Hungerford, deceased.

THE CHANCELLOR: This case is before the court on a bill of interpleader. Mrs. Hungerford died testate in Atlanta, Georgia, on November 28th, 1935, and, at the time of her death, owned, among other things, 1252 shares of the capital stock of the complainant company, which is a corporation of this State. Her will was dated August 12th, 1933, and, after her death, was duly probated in Fulton County, Georgia, and letters testamentary on her estate were granted in that County and State to Julian Riley and Hughes Spalding, the executors named in her will. The claim having been made that, at the time of Mrs. Hungerford's death, she was domiciled in the City of New York, on a subsequent date her will was, also, probated in that State, and letters of administration *c. t. a.* were granted to the New York Trust Company, one of the defendants. Both the Georgia executors and the New York administrator claim title to the stock in question and demand that new certificates be issued accordingly; and this bill was filed because of these conflicting claims.

Subject to certain exceptions that need not be considered, it is conceded that a personal representative appointed in the state in which the deceased person was domiciled at the time of her death has title to her personal estate, including shares of corporate stock issued by corporations of other states. *Wilkins v. Ellett,* 9 *Wall.* 740, 19 *L. Ed.* 586; 21 *Amer. Jur.* § 861, *p.* 854. The question to be determined, therefore, is whether, at the time of Mrs. Hungerford's death, she was domiciled in the State of Georgia, or in the City of New York. The executors of Mrs. Hungerford make two contentions:

1. That her will was finally probated, in solemn form, in Fulton County, Georgia, and therefore, after legal notice to all parties interested in her estate, including Mr. Hunger-

ford, her surviving husband; that, though she owned real estate in Georgia, the place of her domicile at the time of her death was an essential and material issue in that proceeding, and as the court found that she was then domiciled in Fulton County, Georgia, applying the principles of *res judicata* that question cannot be again litigated in this court, even though the New York administrator was not a party to the Georgia proceedings.

2. That, in any event, the facts proved show that on November 28th, 1935, both Hungerford and his wife were domiciled in Fulton County, Georgia.

The latter contention will be considered first, and in disposing of it certain general principles must be considered.

For most purposes the domicile of the husband fixes the domicile of the wife (*In re Daggett's Will*, 255 *N. Y.* 243, 174 *N. E.* 641, 75 *A. L. R.* 1251; *Porto Rico Ry., Light & Power Co. v. Cognet,* (1 *Cir.*) 3 *F. 2d* 21; *Beale Conf. Laws,* 198; 19 *C. J.* 414) ; and the claim that Mrs. Hungerford was domiciled in the City of New York at the time of her death is based entirely on the contention that prior to their marriage on June 12th, 1932, Mr. Hungerford had long been a resident of that city and had never changed his legal domicile to Fulton County, Georgia.

When a man once acquires a domicile in a particular place, that place remains his domicile until he acquires another (*In re Estate of Dorrance*, 115 *N. J. Eq.* 268, 170 *A.* 601; *Texas v. Florida,* 306 *U. S.* 398, 59 *S. Ct.* 563, 830, 83 *L. Ed.* 817, 121 *A. L. R.* 1179) ; and the burden of establishing that a change of domicile has taken place rests on the party asserting it. *In re Estate of Dorrance,* 115 *N. J. Eq.* 268, 170 *A.* 601; *Texas v. Florida,* 306 *U. S.* 398, 59 *S. Ct.* 563, 803, 83 *L. Ed.* 817, 121 *A. L. R.* 1179; *State v. Frest,* 4 *Har.* 558. In order to effectuate a change of domicile, it is necessary that a person shall, in fact, remove from the old domicile to the new, with the intention of abandoning the

old and of remaining permanently or indefinitely in the new. *In re Estate of Dorrance*, 115 *N. J. Eq.* 268, 170 *A.* 601; *State v. Frest*, 4 *Har.* 558; *Dicey Conf. Laws*, (2d Ed.) 111.

In *State v. Frest*, 4 *Har.* 558, the Court of General Sessions aptly said:

"Domicil, or residence in a legal sense, is determined by the intention of the party. He cannot have two homes at the same time. When he acquires another he loses that home which he has exchanged for the new one. To effect this change there must be both act and intention. 'Mere intention to acquire a new domicil without the fact of removal avails nothing; neither does the fact of removal without the intention.' "

In other words residence, in fact, coupled with the purpose to make that place one's home are the essential elements of domicile. *Texas v. Florida*, 306 *U. S.* 398, 59 *S. Ct.* 563, 830, 83 *L. Ed.* 817, 121 *A. L. R.* 1179; *State v. Frest*, 4 *Har.* 558; 1 *Beale Conf. Laws*, § 15.2, *p.* 133.

No definite amount of time spent in a place is necessary to show an intent to make it a home; and if the fact of residence and the intention to make the new place of abode concur, even for a moment, a change of domicile takes place. 1 *Beale Conf. Laws*, §§ 15.2, 13.3, *pp.* 134, 126. That does not mean, however, that the length of residence is never to be considered in determining questions of domicile.

A man, by merely desiring to do so, cannot retain an old domicile when he gives up his old home and acquires a new one. 1 *Beale Conf. Laws*, § 19.2, *p.* 149; *In re Estate of Dorrance*, 115 *N. J. Eq.* 268, 170 *A.* 601.

In 1 *Beale's Conflict of Laws, Section* 19.2, *page* 149, *supra*, the author points out:

"It is not enough that a man desires to acquire or keep a legal residence or legal domicile; the intention necessary for the acquisition of a domicile is the intention as to the fact, not as to the legal consequences of the fact. 'A man's home is where he makes it, not where he would like to have it.' "

An intention to abandon a former domicile may co-exist with an indefinite or, as it is often called, a floating intention to return at some time to the abandoned domicile and again make a home there. *Beale's Conf. Laws,* § 18.2 *p.* 145; *State v. Frest,* 4 *Har.* 558; *Gilbert v. David,* 235 *U. S.* 561, 35 *S. Ct.* 164, 59 *L. Ed.* 360; 19 *C. J.* 407; see, also, *Texas v. Florida,* 306 *U. S.* 398, 59 *S. Ct.* 563, 830, 83 *L. Ed.* 817, 121 *A. L. R.* 1179.

As was said in *State v. Frest, supra,*

"It is not necessary that a man should determine never to come back, either temporarily or permanently, in order to lose his residence * * * 'If a person has actually removed to another place, with an intention of re-maining there for an indefinite time, as a place of present domicil, it becomes his place of domicil, notwithstanding he may entertain a floating intention to return at some future period.' "

In other words, an intention to return to the former domicile, at a remote or indefinite period, will not control, if other facts, which constitute domicile, give the new resi-dence the character of a permanent home or place of abode. 19 *C. J.* 407, *supra.* A mere contingent intention to return to a former place of abode, therefore, will not prevent the acquisition of a new domicile. 19 *C. J.* 408.

A person's declarations are frequently important in ascertaining his intent, where questions of domicile are involved, but his conduct is the most important evidence of his intention to acquire a domicile in a particular place. *Texas v. Florida,* 306 *U. S.* 398, 59 *S. Ct.* 563, 830, 83 *L. Ed.* 817, 121 *A. L. R.* 1179; 1 *Beale Conf. Laws,* § 41 *C, p.* 253. If, therefore, there is a discrepancy between his declarations and his acts, his declared intention, if any, must yield to the conclusion fairly drawn from the facts and circum-stances proved. *Texas v. Florida,* 306 *U. S.* 398, 59 *S. Ct.* 563, 803, 83 *L. Ed.* 817, 121 *A. L. R.* 1179; 1 *Beale Conf. Laws,* § 41 *C, p.* 253. The very fact of actual residence in a place is a circumstance that tends to prove domicile in that place. 1 *Beale Conf. Laws,* § 41*C, p.* 254. If a man has a

wife, or a wife and family who reside in a particular place, in most cases that is also some evidence that he makes his home at the same place (1 *Beale Conf. Laws,* §§ 13.3, 41 *C.* 3, *pp.* 126, 258) ; and the longer the occupancy the stronger the inferences to be drawn therefrom. All this, however, is prima facie evidence that may be rebutted by other pertinent facts and circumstances proved, but if a house in a particular place has been occupied and used for a considerable length of time by a husband and wife, as their preeminent headquarters, in the absence of any other circumstances indicating a contrary intent it is strong evidence that it is their home, both in point of fact and purpose. *Texas v. Florida,* 306 *U. S.* 398, 59 *S. Ct.* 563, 803, 83 *L. Ed.* 817, 121 *A. L. R.* 1179.

As is pointed out in *Restatement of Conflict of Laws, Section* 13:

"A home is a dwelling-place of a person, distinguished from other dwelling-places of that person by the intimacy of the relation between the person and the place. * * * In determining whether a dwelling-place is a person's home, consideration should be given to:

"1. Its physical characteristics;

"2. The time he spends therein;

"3. The things he does therein;

"4. The persons and things therein;

"5. His mental attitude towards the place;

"6. His intention when absent to return to the place;

"7. Elements of other dwelling-places of the person concerned."

See, also, *Texas v. Florida,* 306 *U. S.* 398, 59 *S. Ct.* 563, 803, 83 *L. Ed.* 817, 121 *A. L. R.* 1179.

When a husband and wife live together at the same place, and the legal domicile of the husband is in issue, any acts or declarations of the wife, tending to show, whether or not they regard that place as their home, are pertinent facts and circumstances to be considered in determining the

question of her husband's domicile. 1 *Beale Conf. Laws*, § 41*B*, *p.* 245; *Porto Rico Ry., Light & Power Co. v. Cognet*, (1 *Cir.*) 3 *F*. 2*d* 21.

The Hungerfords were married at Cambridge, Maryland, while visiting friends near that place on June 12th, 1932. Mr. Hungerford then lived in an apartment in New York City, but never occupied it after his marriage. In fact, he gave it up on June 16th, 1932, and never thereafter had any fixed place of abode in that city or state, nor did he have any occupation there at the time of his marriage, or at any time subsequent thereto. Prior to Mrs. Hungerford's trip to Cambridge, she had been stopping temporarily at a New York hotel, but then owned and occupied an elaborate house and grounds in or near Atlanta, Fulton County, Georgia. After their marriage, the Hungerfords returned to New York and stayed a few days at the hotel at which Mrs. Hungerford had been stopping before she went to Cambridge. They then went on a short wedding trip to Atlantic City and Virginia Beach, and from there to Mrs. Hungerford's house at or near Atlanta, where they remained for some ten days. They then went to New York and, after staying a day or so in a hotel there, sailed for Europe early in July and remained there about four months. They returned from Europe in November of 1932 and after spending a few days in a New York hotel went to Mrs. Hungerford's Atlanta house. They arrived in Atlanta shortly after the middle of November and remained there a greater part of the time until February of 1933, when they went to Florida for the winter. During their absence the Atlanta house had been in charge of a caretaker who opened and aired it from time to time. He voluntarily left their employ in June of 1933, but testified that while he was employed there the house was always ready for occupancy on three hours' notice. On their return from Florida in the spring of 1933, the Hungerfords again opened the Atlanta house, and, with the exception of occasional absences on trips to New York, Asheville, and perhaps elsewhere, occupied it with a full

corps of servants until October of that year. In that month they closed the house and went to Hot Springs, Virginia, for a short stay, and from there to a New York hotel for a little more than a month, but returned to Atlanta for Christmas. At that time they stopped at one of the hotels in that city because they intended to go to Florida in January of 1934. About the middle of January of that year they went to Florida. While there, in March of 1934, Mrs. Murphy, Mrs. Hungerford's mother, had a stroke of paralysis and, as a result of a family council, it was decided that Mrs. Hungerford should take charge of Mrs. Murphy's house in Atlanta and live there, at least, for the time being. Pursuant to this plan, the Hungerfords went to the Murphy house on Peachtree Street in April of 1934, and, with the exception of absences on a few trips, remained there for about eighteen months, or until the death of Mrs. Hungerford in November of 1935. At that time, Mrs. Murphy was still living, but had been under the care of a nurse since she was first stricken with paralysis. During their stay at the Murphy house, Mr. and Mrs. Hungerford had ample living quarters for their own separate use, and Mrs. Hungerford even kept her personal maid. At least, after their return from Europe, it seems clear that they made Mrs. Hungerford's Atlanta house their real and pre-eminent headquarters until their temporary removal to the Murphy house in April of 1934. They were away on trips from time to time, but that was the place to which they always returned; and after they moved to Mrs. Murphy's house, Mrs. Hungerford went to her house on Paces Ferry Road almost daily, and particularly in the latter part of her life frequently spoke of it as her home, and of her attachment for it. She, also, on occasions took friends out there for lunch, and there is some evidence that Mr. and Mrs. Hungerford sometimes spent weekends there entertaining friends. Whatever the reason for their stay at the Murphy house may have been, it cannot be said that they did not make Atlanta their headquarters from April, 1934, until November 28th, 1935, the

date of Mrs. Hungerford's death. They were away on a trip in the late summer or early fall of 1935, which was materially extended by Mrs. Hungerford's illness, but returned to Atlanta as soon as she was able. While away on that trip, Mrs. Hungerford continued to pay her maid whom she had left in Atlanta, and on several occasions wrote about coming "home." When she returned she, also, stated that they would be in Atlanta right along.

The New York administrator claims that the evidence shows that the Hungerfords intended to close the Atlanta house permanently in October of 1933, but it does not clearly sustain that contention. It is true that both the cook and the maid were discharged at that time, but both Mr. and Mrs. Hungerford made statements to the effect that they were going away on a trip, and that when they returned they wanted them back. Mrs. Hungerford paid the maid and when she did so said "we are going away for a trip to New York. * * * Mr. Hungerford wants to close the house and dismiss all of the servants. I don't know why. When I come back I want you to come back and work for me." In her testimony, the maid also added that Mrs. Hungerford took her 'phone number. Mr. Hungerford personally paid the cook. At that time he not only told her that they were closing the house for a time and going on a trip but also said "if you are not working when we come back we want you when we come back."

In the spring of 1933, the Hungerfords entertained a number of guests at the house on West Paces Ferry Road, some of whom were old New York friends of Mr. Hungerford. Various entertainments from time to time for the Atlanta friends of Mrs. Hungerford were, also, given there. During the same period certain material changes and improvements were made in the house, and a tennis court was laid out. At that time there was a swimming pool in the basement of the house, under the kitchen and servants' quarters, and Mr. Hungerford seems to have made state-

ments relating to plans for the construction of an outdoor swimming pool, which would naturally entail considerable expense; an expense which would hardly have been considered if he had not intended to make the Atlanta house his home. That house was occupied by the Hungerfords during the Christmas holidays of 1932, and at that time Mr. Hungerford went to New York and brought his mother to Atlanta to visit them.

On a few occasions shortly after their marriage, Mr. Hungerford registered their names at various hotels as being from New York, but after their return from Europe in November of 1932, in almost every case on their numerous stays at hotels, both in New York and elsewhere, he entered their names on the registers as residing at 509 West Paces Ferry Road, Atlanta, Georgia. He gave the same address when he joined the Surf Club in Miami in 1933. He states that all of these registrations were due to an understanding between him and his wife that the Atlanta house should be used as a convenient mailing address when they were traveling, but he continued to make the same entries on the hotel registers on the last trip made by them in the late summer or early fall of 1935, though they had then moved to the house of Mrs. Hungerford's mother and had been living there for some time. In view of the fact that this practice was continued during the whole of their married life, after the first few weeks, Mr. Hungerford's explanation hardly seems satisfactory.

In March of 1933, Mr. Hungerford changed his resident-membership in two New York clubs to that of a nonresident member, giving his address as Atlanta. In 1933 and 1934, he became a resident member of two clubs in Atlanta. He first applied for non-resident membership in both of them, but, on their taking the position that he was a resident of Atlanta, he accepted membership on that basis and apparently continued to hold them in the same manner.

The only business activity that Mr. Hungerford had during his married life was the management of the affairs of the Trebor Securities Corporation, which was organized for the purpose of buying and selling securities. That corporation was organized shortly after his marriage, and its books and records were originally kept at a lawyer's office in New York City, but in June of 1934 he directed that they be sent to Atlanta, in order that the proper tax returns might be prepared there, stating that he did not expect to be in New York for many months. On its organization, that corporation had opened a bank account in the Chase National Bank in New York City, which account was opened in December of 1932, and Mr. Hungerford then gave the Atlanta house of Mrs. Hungerford as his address. Mr. Hungerford's personal belongings, including, what was apparently family jewelry and various stock certificates standing in his name were kept in Atlanta, and on his return from Europe in 1932 he brought to the Atlanta house a considerable amount of clothing purchased while on that trip. So far as appears, the only property belonging to him in the City of New York was a bag, a rug and a few paper packages left by him with a friend in that city shortly after his marriage.

In August of 1933, Mrs. Hungerford went to an Atlanta hospital for an operation and remained there about thirty days, giving the house on West Paces Ferry Road as her address. Prior to entering the hospital, she had her will drawn in Atlanta and executed it there on August 12th of that year. It was headed "Georgia, Fulton County:." The Atlanta house was kept open during her absence, and Mr. Hungerford stayed there a greater part of the time, though, for some unexplained reason, on two occasions he registered in Atlanta hotels, giving the house on West Paces Ferry Road, Atlanta, as his address. In March of 1934, Hungerford, also, went to a hospital in Atlanta for an operation, and gave the Murphy house in Atlanta as his address.

Mr. Hungerford lived in New York until June of 1932, and apparently had no personal income requiring the filing of an income tax report after that time. He filed a tax report at the proper time in the State of New York for the year 1932, but it naturally comprised income prior to the twelfth day of June of that year, and, therefore, has no bearing on this question. Mrs. Hungerford filed both State and Federal income tax reports for the years 1932, 1933 and 1934 in the City of Atlanta, and all of her books and records were kept there. She died on Thanksgiving Day of 1935, and therefore before the prescribed time for filing a report for that year. For the year 1932, these tax returns were made out for her by an Atlanta lawyer, whom she named as one of the executors of her estate. Her returns for the years 1933 and 1934 were made by a firm of certified public accountants in Atlanta, who were employed by Mr. Hungerford, and under whose supervision they were prepared, and the clear inference from the facts is that he knew they were intended to be, and were, filed with the proper officers in Atlanta. Under the law of Georgia, a person who resides in that State for more than six months in any one year is required to pay an income tax. The exemption given such a person is, however, much less than that allowed a person who is domiciled there. Mrs. Hungerford, in effect, not only stated in her state return that she was domiciled in Georgia, but claimed and deducted an exemption accordingly. The New York administrator claims that the record shows when the accountants were making out Mrs. Hungerford's tax reports, Mr. Hungerford stated that he was a resident of New York. There is some evidence from which that conclusion might be drawn, but in explanation of what he had previously said the witness further testified:

"Q. Your best recollection is that he (Mr. Hungerford) said he was a citizen of New York, isn't that what you mean? A. The substance was he made his return in New York, now as to whether he actually said he was a citizen of New York I would not say he actually made that statement."

Mr. Hungerford filed no individual tax report in the State of New York for the years 1933 and 1934, and, therefore, this statement could only have referred to the tax return filed for the year 1932 for income received prior to June 12th of that year.

While in Georgia, both Mr. and Mrs. Hungerford used cars bearing Georgia license tags. The car used by Mr. Hungerford was purchased in the name of the Trebor Securities Corporation, which was a Delaware corporation, but it was, nevertheless, entirely used by him personally. He used stationery bearing the address of the house on West Paces Ferry Road, in Atlanta, belonging to Mrs. Hungerford, and Mrs. Hungerford, also, kept her account in an Atlanta bank.

Mr. Hungerford stated that Mrs. Hungerford wished to travel for about two years after their marriage and did not want him to engage in any business occupation during that period. But, however that may be, while they were staying at the house of Mrs. Murphy, Mrs. Hungerford seems to have stated on various occasions that every man, including Mr. Hungerford, should have some occupation. The evidence indicates that Mr. Hungerford was, at least, interested in procuring a liquor agency in Georgia in the early part of 1935, but whether he intended to give it his entire personal attention, so that he would be required to spend all of his time in Georgia, is, however, disputed.

As I have already pointed out, the precise question to be determined is whether, on the death of Mrs. Hungerford, on November 28th, 1935, she was domiciled in Fulton County, Georgia, or in the City of New York. The answer to that question depends entirely on whether the evidence shows that after Mr. Hungerford's marriage he left New York and went to Atlanta, Georgia, to live, with the then or subsequent intent to make that his home permanently, or, at least, for an indefinite period. The New York administrator contends that, particularly in view of the fact that the bur-

den is on the Georgia executors to show that Mr. Hungerford had such an intent, no such conclusion can be fairly drawn from the evidence. It is not denied that the Hungerfords lived together as husband and wife from the date of their marriage on June 12th, 1932, until Mrs. Hungerford's death, or for a period of nearly three and one-half years. During practically the whole of their married life, prior to April of 1934, though they were away on frequent trips of varying duration, the house owned by Mrs. Hungerford in Atlanta was their real headquarters, and Mr. Hungerford had no place in the City of New York that he could call home. After April of 1934 they still made Atlanta their headquarters, but because of the illness of Mrs. Murphy they had moved temporarily to her house. It is true that both shortly after their marriage, and on repeated occasions thereafter, statements were made, particularly by Mrs. Hungerford, but sometimes by Mr. Hungerford, indicating an intent to sell or close the Atlanta house, and to ultimately rent or purchase an apartment in New York City. Either one, or both of them, looked at apartments in that city on at least two occasions. The first time in the spring of 1933 and the last time in the early fall of 1935, but there is nothing to indicate that Mr. Hungerford ever intended to return to New York to make that his home, without his wife. In fact, whether they procured an apartment there and made it their home depended entirely on whether Mrs. Hungerford was willing to take that step. The fair inference from the evidence is that in the early days of their married life, and perhaps prior to 1935, any contemplated removal to New York depended largely on what was to be done with the Atlanta house. This would seem to be indicated by the statement of Mrs. Hungerford in the fall of 1933 that they had not been able to sell it. In the early fall of 1935, Mr. Hungerford, also, stated to a New York real estate agent "that he and his wife were again desirous of finding some place" in New York.

Depending on the circumstances "a statement of future intention may be a well settled intention, soon to be acted on, or it may be a mere loose, speculative suggestion, not intended seriously." 1 *Beale Conf. Laws*, § 41 *B*, *p*. 246.

When considered as a whole, the evidence justifies the conclusion that long prior to November 28th, 1935, Mr. Hungerford, both in point of fact and purpose, had made Atlanta his home, and had intended to continue to make it his home certainly for an indefinite time; and any possible intent that he may have had to return to New York at some future time, depending, as it did, on the attitude of Mrs. Hungerford, was, therefore, a mere hope or wish of an indefinite, or so-called floating nature, that in no way affected his becoming legally domiciled in the State of Georgia. The preparation and filing of Mrs. Hungerford's income tax reports in the years 1933 and 1934, under his supervision, are inconsistent with any other conclusion. Many other facts and circumstances, including the changes made in the Atlanta house and the contemplated outdoor swimming pool, justify the same conclusion.

As the facts show that Mrs. Hungerford, at the time of her death, was legally domiciled in Fulton County, Georgia, it is unnecessary for me to consider whether the New York administrator is bound by the judgment entered by the Georgia court.

From the foregoing it necessarily follows that the executors named in Mrs. Hungerford's will are entitled to certificates for the shares of stock in controversy.

A decree will be entered in accordance with this opinion.

Note. On appeal to the Supreme Court, the decree entered in this cause was reversed. See *New York Trust Co., etc., vs. Riley, et al., post p.* 354, 12 *A.* 2d 772.