ESTATE OF ANTHONY H. G. FOKKER, CARTER TIFFANY, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 111851. Promulgated June 29, 1948.

*Mathias F. Correa, Esq.,* and *John P. Ohl, Esq.,* for the petitioner. *Henry C. Clark, Esq.,* for the respondent.

OPINION.

ARNOLD, *Judge*: The first question is whether decedent was a *resident* of the United States at the date of death. The Internal Revenue Code imposes an estate tax upon the net estate of every decedent, citizen or resident of the United States, dying after its enactment. Sec. 810. Fokker was not a citizen of the United States at any time. If the estate is liable for tax, it is because Fokker died a resident of the United States. A resident of the United States, under the applicable regulations, is one who, at the time of his death, had his domicile in the United States. Sec. 81.5, Regulations 105. Section 81.5 also states that:

A person acquires a domicile in a place by living there, for even a brief period of time, with no definite present intention of later removing therefrom. Residence without the requisite intention to remain indefinitely will not suffice to constitute domicile, nor will intention to change domicile effect such a change unless accompanied by actual removal.

In this case the petitioner concedes that Fokker established a domicile in the United States in or about 1926 or 1927. It is contended that he abandoned his domicile here when he acquired his house in St. Moritz, Switzerland. It is further contended that his domicile thereafter remained in Switzerland, despite his purchase of the Nyack house, unless it can be shown that he intended to give up his Swiss home and establish a new place of abode at Nyack. In other words, petitioner argues that decedent's intention to make Switzerland his home is presumed to continue until the end of his life.

We think the fallacy in this argument is the premise upon which it is based. We can not find from the facts of record that decedent intended to, or did, abandon his domicile in the United States. Never having abandoned his American domicile, it is axiomatic that no change of domicile occurred. It is true that Fokker was absent from this country periodically during the time that petitioner contends he acquired a domicile in Switzerland. Such absence, even though long continued, is insufficient, however, to effect a change of domicile. "There must be," as the Supreme Court pointed out in *Mitchell* v. *United States*, 88 U. S. 350, "the *animus* to change the prior domicile for another. Until the new one is acquired, the old one remains."

The facts herein are ample, in our opinion, to disprove any intent of the decedent to abandon his American domicile. Our findings show that at no time from 1927 until his death was Fokker without an American home fully staffed with servants. The nature of his business and the scope of his varied interests were such that his physical

occupancy of his American homes was of short duration. But he did maintain at all times after 1927 a home in America to which he could and did continually return. He repeatedly, and without exception, stated under oath to immigration officials that his residence was in New York or New Jersey, in order to secure permits to reenter this country. Petitioner attempted to explain these sworn statements away by testimony that the making of such statements eased decedent's travel difficulties to and from Europe. We are not impressed by this explanation. We think decedent's sworn statements of his intentions to return to this country and that his absences were temporary and principally for business reasons are entitled to more weight than the testimony aforementioned. See *L. E. L. Thomas*, 33 B. T. A. 725, and portion of opinion quoted in footnote.[1]

Our findings are studded with other business, personal, and factual incidents of Fokker's life indicating that his actual residence was in this country. We need not summarize these incidents, but pass directly to petitioner's contention that Fokker's activities in 1935 and 1936 show his intention to abandon this country as his domicile and to establish a new domicile in Switzerland. The contention that St. Moritz became his new domicile rests primarily upon his purchase of Ober Alpina. In fixing Ober Alpina as Fokker's new domicile, petitioner contends that consideration should be given to its physical characteristics, the time he spent there, the things he did there, the persons and things therein, his mental attitude toward it, his intention when absent to return thereto, and a comparison with his other dwelling places, citing Restatement, Conflict of Laws, sec. 13. We shall examine the facts with respect to these factors in the order stated.

Physically, Ober Alpina was larger than decedent's home at Alpine, New Jersey, but smaller than Undercliff Manor on the Hudson. Any comparison of his own houses would have to be between his New York and his St. Moritz houses, since the Alpine house was occupied under a lease. At both properties Fokker made extensive alterations for his own convenience. From the standpoint of expenditures, his alterations at Undercliff Manor were much more expensive. One outstanding difference between the two places should be noted here. St. Moritz was a resort town, which specialized in the entertainment of foreign tourists, but attracted very few Swiss. It is internationally

---

[1] In order to avail himself of the provisions of the immigration laws and obtain an easy reentry into the United States the petitioner held himself out to the immigration authorities as one who had been admitted to the United States for permanent residence and represented that in going abroad he was not abandoning the residence and domicile established here, but was going abroad temporarily and would return just as early as his business engagement, the duration of which was fairly definitely fixed, would permit. Having thus held himself out and satisfied the immigration officials that his absence was to be only temporary and thereby having obtained the benefits of his action, we think he is to be bound by it. Little weight is to be given statements that he now makes to the effect that his intentions then were contrary to what his acts purported them to be. [P. 736.]

famous for its scenery and winter sports. Nyack, New York, on the other hand, had no such international appeal, and decedent's acquisition of this place of abode must have been for a different reason. Both houses were substantial, permanent structures, suitable for year-round living, and we can not say that the specially designed bathtub and mechanical conveniences of St. Moritz have more probative weight than the mechanical conveniences, pipe organ, projection booth, and concealed screen of Undercliff Manor. The mechanical experiments at Ober Alpina with a snowplow are completely overshadowed by the designing and construction of the *QED*. The winter sports of St. Moritz were offset by the yachting and fishing on his boats from Nyack and Montauk.

Petitioner points out that during 1935 and 1936 Fokker was actually present at Ober Alpina about eight months, but contends that this does not convey a full picture of the time he spent there, since he kept it fully staffed and open at all times until his death. But it is equally clear from the facts that Fokker maintained his Alpine and Nyack houses open and staffed at all times from 1927 until his death. If time spent in Undercliff Manor after its purchase be compared with the time spent in Ober Alpina over the period that Fokker maintained both houses, it is at once apparent that Undercliff Manor was his principal residence. Furthermore, the facts, and petitioner's contentions, show that much of Fokker's time in Europe was spent away from Ober Alpina for business and other reasons.

Fokker's activities at Ober Alpina were of a social and business nature. The facts show that he used it to entertain his personal friends and relatives, as well as his business acquaintances. His business activities there seem to have been the more important. It is shown, for example, that he usually spent his mornings in bed conducting his business affairs by conferences and long distance telephone calls. He entertained prominent government and air line officials there, business acquaintances, and officials of the Dutch company—all for the purpose of promoting his business interests. Indeed, one of petitioner's witnesses stated that Fokker wanted Ober Alpina in order "to be able to entertain there people who had interest, like Dutch Ministers and foreign ministers, to invite them for lunch and dinner and have them out there and to get in good contact with them, for which purpose it was a good place." Again, in describing Ober Alpina, this witness stated that Fokker "had a place what we would call nowadays for public relations purposes." Entertainment other than for business reasons seems to have been confined largely to Christmas and New Year's parties for relatives and friends.

We think the manner in which Fokker operated Ober Alpina is enlightening. Being a widower, he sought the services of the daugh-

ter of an old friend of the family to act as his official hostess. This lady had independent means and was not in the employ of Fokker. Her operation of the house and management of the servants made it certain that important house guests would be properly entertained and their needs provided for. It is urged that the presence of an official hostess at Ober Alpina and the absence of such a hostess at any other home maintained by Fokker is practically conclusive evidence that Ober Alpina was his only home. We are not persuaded by this argument. We think Fokker installed an official hostess to insure the success of his social and business entertaining; that business guests were of primary importance in the use of Ober Alpina; and that he used it primarily to assist him in his business transactions. We do not mean to say that Fokker derived no personal benefits and pleasures from his house in St. Moritz. He certainly benefited in so far as his sinus condition was concerned by his sojournings in Switzerland. But we can find no conclusive evidence in these factors that justify a determination that Fokker established a new domicile in Switzerland.

We should like to comment further on the factor of persons and things at the alleged new domicile. Although insisting that Fokker had changed his domicile to Switzerland, petitioner points out that the paraphernalia, furnishings, and paintings were essentially Dutch, as was the decedent. It is also pointed out that Fokker brought a solid silver service from the United States which he used in Ober Alpina, and it is urged that under the decision in *In re Trowbridge's Estate*, 266 N. Y. 283; 194 N. E. 756,[2] this act showed an intention on the part of Fokker to change his domicile. We note, however, that Fokker furnished his Alpine house, in part at least, with furniture and furnishings acquired by him while living in Germany, which he shipped to Holland and from there to America. Concededly he had an established domicile in America in 1927, and our findings show that, with minor exceptions, of which the silver service is undoubtedly one, all of the furniture and furnishings brought over here and used in establishing his American domicile remained in this country and was a part of his personal property in this country at the time of his death. The *Trowbridge* case would, therefore, support the decision which we have reached.

Petitioner asserts that Fokker prized Ober Alpina as a home in the truest sense. As proof of this mental attitude on Fokker's part, our attention is directed to a statement made to his hostess in a letter postmarked August 19, 1935. We have set forth the pertinent portion of the letter in our findings. Petitioner emphasizes that portion of the

---

[2] In this case the New York court found that domicile had shifted from an earlier to a later home in a town called Noroton. The statement relied on in the opinion is as follows (p. 759) : "Furnishings and silver were removed to the Noroton household."

statement in which decedent says he could go to Ober Alpina "and always find a home there * * *." We think the statement should be read in its entirety. When so read, a different meaning results. Fokker was expressing appreciation to Miss de Leuw for her "help, administration and company." He said, further, that because thereof it was a load off of his mind to know that he could go to Ober Alpina for his pleasure and always find a home there with a pleasant atmosphere. He did not say, or mean, that she had made a home for him; she was his official hostess. What he meant and said was that she had created a homelike atmosphere which he enjoyed and which he found peaceful and restful. The statement was a compliment to Miss de Leuw's ability and success as the official hostess and manager of a rich man's show place at an international resort. We have no doubt that Fokker was proud of his Swiss chalet and its accoutrements. We are convinced that he used every means that wealth commands to make his guests comfortable and satisfied. But, even so, we can not say that he acquired and renovated Ober Alpina with the intent of making it his permanent home.

The next factor for consideration is Fokker's intention to return to Ober Alpina when absent therefrom. Petitioner contends that the best evidence of Fokker's intention when absent from St. Moritz to return is the fact that he always did. But this statement is equally applicable to the United States, and it is particularly true with respect to his absences from Holland. Our findings show that he was born a Dutchman, lived a Dutchman, and died a Dutchman. His closest relatives resided in Holland. When he went abroad from America he always went to Holland. He prided himself as being the "Flying Dutchman." His furnishings at St. Moritz were Dutch, he flew the Dutch flag from his Swiss chalet, and the Royal Dutch Yacht Club emblem from his boats. He died a citizen and subject of Holland. He was buried in Holland. He had no interests in Switzerland except the chalet which he used for winter sports, business, and entertainment purposes. He probably would have returned to Switzerland year after year for its winter sports, its gay holiday atmosphere, and for his health's sake, a custom he had followed before he acquired Ober Alpina. But this custom is not the equivalent of domicile. And any inference of domiciliary intent therefrom is rebutted by the continuous precaution on his part to insure his reentry into America before he left for Europe. One does not go to his domicile with the fixed intention of leaving for the place of his departure within a year. It is much more reasonable and logical to say that the place from which he departed and to which he intended to return within the year was his fixed place of abode.

Much has already been said about the physical characteristics of the plural homes maintained by Fokker. The situation here is not comparable, therefore, to the maintenance of a hotel room or a small apartment as compared with a home owned and maintained elsewhere. It is conceded that petitioner established a domicile in this country in or about 1927. From that date until his death he maintained a home staffed and ready for occupancy at all times. When he acquired the Nyack house he did not renew his lease on the Alpine house, a place he had rented and occupied from time to time for about ten years.

In discussing the documentary evidence in the voluminous record in this case petitioner points in particular to the will of the decedent and to a statement made by him in the exchange of correspondence with Major General Oscar Westover. In his will decedent specifically referred to himself as "a citizen of the Kingdom of the Netherlands, temporarily sojourning in the United States of America." Petitioner sees in this formal statement a refutation of any American domicile. When it is considered that this is the year in which petitioner is contending that Fokker established a new domicile in Switzerland, it is a fact that cuts both ways. Certainly there is nothing in the quoted portion of the will to indicate that Fokker had established his domicile at St. Moritz. On the contrary, he gave to his executors in Holland full authority to act with respect to all his property outside the United States, and gave Tiffany like authority over his United States property. No mention is made of Switzerland or a home in Switzerland. As previously stated herein, Fokker lived and died a Dutchman, and, when he thought in terms of his property after his demise, it was to Holland that he turned for his sole beneficiary, and for his executors except for his United States property.

The second statement made by Fokker to which petitioner attached great significance is contained in the correspondence set out in our findings. The background of the correspondence is important to a proper understanding of the statement relied on by petitioner. As clearly appears from the letters, Fokker had perfected certain designs for a bomber, a pursuit ship, and a bomb-launching device which he wanted the War Department to advance funds to develop, the designs to become the exclusive property of the United States. In his first letter he pointed out his desire of continuing his activities in this country as a designer and manufacturer of airplanes, and stated that his Dutch company enterprise had always been a matter of secondary interest to him because of Holland's lack of development funds, lack of policy, lack of economic resources, and dependence upon foreign industrial production, and that he would like to secure development funds or design contracts from the United States Air Corps with a Fokker-organized or controlled American company. He requested

Westover to take up the matter with the proper authorities in the State and War Departments. Westover replied that Fokker would have to clarify his status in this country with the State and Commerce Departments before the Air Corps could consider further negotiations. It was in reply to Westover's letter that Fokker made the statement that he felt he was at a disadvantage as a nonresident alien in negotiating contracts with the American Government. This statement is but one of three conclusions which Fokker stated he had reached in considering the problem of developing the designs in question. The other two considerations are equally a part of the whole subject about which Fokker stated he had given "considerable thought" in arriving "at the following conclusions." First, that he should not be burdened with the organization of a new company and its commercial development, but should concentrate on commercial and military designing for airplanes; second, his feeling that he was at a disadvantage in negotiating contracts; and third, that a business and financial arrangement with one of the large recognized aviation companies in America would best serve the interests of all concerned.

Whatever Fokker may have had in mind in stating to Westover that he was a nonresident alien on October 22, 1936, it is a fact that within three weeks thereafter he had purchased the Nyack estate and ordered certain alterations to be made. If his characterization of himself as a nonresident alien at that time is to be considered conclusive, as petitioner argues, then his acts subsequent thereto and his formal statement made shortly before his death are entitled to equal weight as showing a changed intention, perhaps in accord with his statement to Westover that details of an arrangement with an American aviation company must be worked out by negotiation.

The last statement made by Fokker before his death was made in connection with securing a passport from the Dutch Consulate General in New York in preparation for a trip abroad. The evidence shows that this passport contained a statement over his signature that his domicile was Nyack, New York. Within four days decedent became unconscious and thereafter died without ever regaining consciousness. It is, therefore, his last formal statement as to where he considered his domicile to be. We think it is entitled to considerable weight in determining where decedent was domiciled at the date of death.

Other facts indicating that decedent did not intend to abandon his American domicile and establish a new domicile in Switzerland are his transfers to and his maintenance in this country of the greater portion of his estate, whereas he maintained in Switzerland only such household effects and furnishings as were deemed necessary for entertaining and business purposes.

In deciding that decedent was a resident of (domiciled in) the United States at the date of his death, we have sought to determine his intention as disclosed by his entire course of conduct, in accordance with the recognized tests prescribed by the decided cases, *Texas* v. *Florida*, 306 U. S. 398; *Sun Printing & Publishing Assn.* v. *Edwards*, 194 U. S. 377; *Frederick Rodiek, Executor*, 33 B. T. A. 1020; affd., 87 Fed. (2d) 328; *Pietro Crespi*, 44 B. T. A. 670, and other cases cited by the petitioner. See also *Walter J. Baer*, 6 T. C. 1195, an income tax case. It must be admitted that there are some facts of record that conflict with our determination, but we are convinced that the weight of the evidence amply supports our conclusion. On this question of domicile, therefore, we affirm the respondent's determination.

The remaining question is the value to be determined for certain guilder assets located in Holland and Switzerland. The value in Dutch guilders of the various items involved is not in dispute. The question is, What rate of exchange shall be used in converting the Dutch guilders into American dollars? There would be no problem if the valuation could be made at the date of decedent's death. At that time the official rate of exchange was $0.531 per guilder. However, petitioner elected, as it had the legal right to do, to have the assets of the estate valued as of one year after decedent's death. In the interval between December 23, 1939, and December 23, 1940, many things happened to destroy values. Holland was invaded on May 10, 1940, and completely occupied by the German Army within a few days. The occupation authorities blocked foreign transactions except as permitted by them. The Dutch Government in exile did likewise, and the United States issued an Executive Order prohibiting foreign exchange, transfer of credit, and the export of coin and currency except as specifically authorized by regulations or licenses issued by the Secretary of the Treasury.

As a result of the various decrees and orders, there was no official rate of exchange for Dutch guilders on December 23, 1940. The evidence shows that Tiffany was unable to convert Dutch guilders in a Swiss bank into Swiss francs which he would have been able to bring into this country. Various witnesses connected with New York banking and financial houses testified to the lack of a market in New York for blocked Dutch guilders. In a similar situation in a gift tax case involving blocked South African pounds, we fixed the amount of the gift as the value of the blocked pounds in this country, *Morris Marks Landau*, 7 T. C. 12. We think the same principle governs here, although we have an estate tax case. We have, therefore, fixed the value of the blocked Dutch guilders at 5 cents per guilder, a value which is conceded by the petitioner.

Since the hearing in this case this Court has considered and decided an estate tax case involving the value of blocked British assets. *Estate of Ambrose Fry*, 9 T. C. 503. In that case it appeared that there was a lawful way in which a certain amount could be realized in the United States upon the British assets, and we held that the value to be included in the decedent's estate could not exceed the value that could be realized in the United States.

In view of the above authorities, we hold that the decedent's guilder assets, and administrative expenses stipulated in terms of guilders, should be converted at 5 cents per guilder. Decedent's estate tax liability should be recomputed in accordance with our determination of the disputed issues and the several stipulations of the parties.

*Decision will be entered under Rule 50.*