**TRAPP v. JONES.**

Civ. No. 3670.

United States District Court
W. D. Oklahoma.

Dec. 2, 1949.

Ram Morrison, J. B. Dudley (of Dudley, Duvall & Dudley), and Charles H. Garnett, Oklahoma City, Okl., for plaintiff.

Robert E. Shelton, U. S. Atty., Oklahoma City, Okl. (Theron Lamar Caudle, Asst. Atty. Gen., Andrew D. Sharpe and Lester L. Gibson, Sp. Assts. to Atty. Gen., on brief), for defendant.

VAUGHT, Chief Judge.

Plaintiff M. E. Trapp seeks to recover the sum of $99,594.35, with interest from November 16, 1944, which he alleges was erroneously assessed on his 1941 income tax return.

A number of issues have been adjusted between the parties which will be covered in the judgment, and this opinion will be directed to those issues not so covered. The parties have stipulated as to the issues involved, as follows:

"I. The correctness of the accounting method used by Tankersley Construction Company, and M. E. Trapp Associated, claiming to be a joint venture, in determining and reporting its distributable net income, i. e., whether it is entitled to and has used the cash receipts and disbursements method of accounting in determining and reporting said income, or whether it used and must now use the accrual method, as determined by the Commissioner.

"II. The effect of the alleged partnership of M. E. Trapp Associated, for the purpose of determining the Federal income tax liability of the alleged partners.

"III. (a) Whether the decision of the Board of Tax Appeals in the case wherein M. E. Trapp, plaintiff herein, was petitioner and the Commissioner of Internal Revenue was respondent, being docket number 93,286 of said Board, constitutes an adjudication that the properties involved in that proceeding were either community properties or properties owned jointly or in common by the plaintiff and Lou Strang Trapp, his wife, and that the income from said properties was either community or joint income of plaintiff and his said wife, by reason of which the defendant in this proceeding is estopped to assert that the income from the same properties, having the same ownership in the later year involved herein, was the separate income of the plaintiff and was not the community or joint income of the plaintiff and his wife and taxable one-half to each.

"(b) In the alternative and in the event the issue stated in (a) above is decided adversely to plaintiff's contention, then whether in fact the properties involved in said Board of Tax Appeals case were either community properties or properties owned jointly or in common by plaintiff and Lou Strang Trapp, his wife, and the income therefrom was their community or joint income and taxable one-half to each.

"(c) Whether properties acquired by the plaintiff and/or Lou Strang Trapp, his wife, the legal title to which may stand in either or both of them, subsequent to the acquisition of the Crisp, King and Bob White oil and gas leases in Texas, are community property or property owned jointly or in common by the plaintiff and his said wife, or are the sole properties of plaintiff.

"IV. Right to deductions of loss of $392.00 from the sale of automobile.

"V. Right to refund of $519.51 assessed and paid in excess of the amount shown in the 90-day letter sent to the plaintiff by the Commissioner of Internal Revenue.

"VI. The right of interest, as provided by the Statute, on any over-payment or refund found to be due the plaintiff.

"VII. The parties reserve the right to raise any other issue or issues which are developed or may result from the evidence adduced at the trial."

For a proper determination of these issues, aside from the bookkeeping controversy, there must be determined the status of (1) the alleged partnership between M. E. Trapp and his wife, Lou Strang Trapp; (2) the alleged partnership between M. E. Trapp and G. T. Blankenship; (3) the alleged partnership between M. E. Trapp, Lou Strang Trapp and M. E. Trapp, Jr.; and, (4) the association in the joint venture between Tankersley Construction Company and M. E. Trapp, Associated.

As to the status of the alleged partnership between M. E. Trapp and Lou Strang Trapp, this type of association is commonly termed a "family partnership." While such a partnership is perfectly legal, both for income tax purposes and other purposes, frequently when they become involved, they are viewed with suspicion. Especially is this true when they are scrutinized for income tax purposes. However, when the evidence, under the rules of law governing partnerships, clearly shows that such a partnership is bona fide and has been entered into and exercised in good faith, we fail to see why any distinction should be made for income tax purposes and any other purposes, and we think the

authorities have become confused by attempting to make such a distinction.

The uncontradicted evidence shows that M. E. Trapp and Lou Strang were married in 1907. Prior to their marriage, Mrs. Trapp had served as clerk of the probate court of Logan County, Oklahoma; had taught school; and had acquired other business experience. She had accumulated personal property consisting of cash, stocks and secured notes. She had some investments with an uncle, who was engaged in the oil business, that proved to be profitable in later years. Soon after the marriage, Trapp was elected state auditor of Oklahoma, serving from 1908 to 1911. Mrs. Trapp continued for some time in employment. Upon the expiration of the term as state auditor, like most politicians, Trapp was without funds to engage in business, so took employment as a traveling salesman. While in the office of state auditor, Trapp had become acquainted throughout the state and had observed that money could be made in the municipal bond field, but had no capital of his own to launch into that field. Both he and Mrs. Trapp had learned that precinct election board claims in Logan County, and other counties in the state, were unpaid for the reason that the counties had no fund out of which the claims could be paid by virtue of a situation brought about by statehood. They knew the claims could be bought cheaply. Mr. Trapp conceived a plan of purchasing the claims, reducing them to judgment, then funding the judgments into county bonds, and selling the funding bonds on the market. This required capital. Mrs. Trapp owned building and loan stock, notes secured by chattel mortgages, county warrants, and the home in which they lived. After considering the matter thoroughly they entered into an oral agreement to go into the bond business, under the terms of which she would furnish her savings and other property as collateral to secure their joint note to obtain the necessary capital, and he would devote his entire time to the business, and they would share equally in the profits. Her property constituted the entire capital for the joint venture. They proceeded to borrow money from the Logan County Bank on a joint note secured by the collateral furnished by Mrs. Trapp. For a time the account was carried in her name alone, but at a later date was changed to a joint account in both their names, each party being authorized to draw on the account. As evidence of this arrangement, a letter was delivered to the bank by Trapp which read as follows:

"June 10th, 1911.
"Mr. A. L. Cockrum, President,
Logan County Bank
Guthrie, Oklahoma.
Dear Mr. Cockrum:
"Some days ago I talked to you about borrowing money from you with which to buy these old outstanding unpaid precinct election board claims, against Logan County. Apparently you did not understand our plan. You advised that, these claims would not be acceptable for collateral and asked me to write you fully as to what I proposed doing with them.

"We are trying to get going in the municipal bond business. What I propose to do is, to buy these claims, which can be bought for fifty cents on the dollar, reduce them to judgment, then fund the judgments into funding bonds, take the bonds in lieu of the judgments, sell the bonds, pay the bank and take the profits.

"As you were advised Mrs. Trapp is interested with me and since talking to you I have discussed the matter fully with her. We think it is a fine opportunity for us to get started in business.

"Mrs. Trapp owns building and loan stock, notes secured by mortgages, some county and state warrants, and also the home in which we live. She has agreed to join with me and share equally with me in business and assign her stock, notes and warrants as collateral to secure payment of any money you may see fit to loan us, and as further security, we will assign the claims we buy for whatever value they may have.

"The Board of County Commissioners are in session today, and advised me that they were willing to issue the bonds just as soon as the judgments become final. I talked with Mr. Kemper, President, Com-

merce Trust Company, Kansas City. He agrees to buy the bonds at par and accrued interest, and in addition will pay a premium.

"Trusting this will make the matter clear to you, and hoping you will find a way to accommodate us,

"Very truly,
/s/ M. E. Trapp"

In their first venture they had $11,722.62 invested in the claims and expense of funding the bonds, on which they realized a profit of $8,270.05. The profits were added to the capital. Later in 1914 when the home was sold, Mrs. Trapp invested the proceeds, approximately $4,000, in their business. In 1915 Mrs. Trapp realized $11,240 from an oil investment with her uncle. All but $400 or $500 of this fund was immediately invested in their business. Mr. Trapp continued to devote his entire time to the business. Mrs. Trapp has never withdrawn any of the capital contributions except for current living expenses. Neither she nor Mr. Trapp had any other money or property as separate property. All the property since the first venture, that either claims or has any interest in, has been carried on their books as joint property, each claiming an undivided half interest. During the early years and as long as her health permitted, Mrs. Trapp was active in their business affairs. In later years the business of the partnership expanded into other fields, particularly the oil business, the details of which were performed and conducted by Mr. Trapp after consultation with Mrs. Trapp. In 1923 Mr. Trapp became governor of Oklahoma, and during his term they ceased business activities to a large extent. In 1931 they again embarked actively in the business under their former arrangement and have continued in their various activities under that arrangement until and including the year 1941, for which the tax returns were filed forming the basis of this action.

All the evidence as to this partnership is uncontradicted and is supported by bank records and the unequivocal testimony of Mr. and Mrs. Trapp. They made known to their bankers and all interested parties from the beginning the status of their business relation. At the time of the oral agreement there was no thought of tax avoidance and clearly was not entered into for that purpose.

For some time since their rendition, the cases of Commissioner v. Tower, 1946, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670, 164 A.L.R. 1135 and Lusthaus v. Commissioner, 1946, 327 U.S. 293, 66 S.Ct. 539, 90 L.Ed. 679, have been used as guideposts in determining the family partnership relation, but these cases have been rather widely misinterpreted by the courts. So much so that in the case of Commissioner v. Culbertson, decided June 27, 1949, 337 U.S. 733, 69 S.Ct. 1210, the Supreme Court took occasion to clarify the family partnership relation. The holding in that case, when applied to the facts in this situation, leaves no doubt in my mind that a partnership relation between M. E. Trapp and Lou Strang Trapp existed from its inception in 1911 up to and including 1941, the year of the return in question here. If a suit were filed by one of the parties seeking a dissolution and an accounting, and the evidence produced in this case were produced in such a suit, the judgment would have to be for an equal division of the assets.

As to the status of the alleged partnership between M. E. Trapp and G. T. Blankenship, the uncontradicted evidence shows that M. E. Trapp and Lou Strang Trapp, and G. T. Blankenship owned stock in the National Bond and Mortgage Company. The corporation determined to dissolve in 1937. It owned lands and first mortgage loans on lands. The Trapps and Blankenship were interested in oil properties and in developing such properties. They traded their stock in the corporation for the lands and mortgages, procuring approximately 175 tracts of land, and to date have sold the surface rights on about 100 tracts, retaining the oil rights. The Trapps have an undivided one half interest in the property and Blankenship the other half interest. They were not real estate dealers as such but were interested only in disposing of the surface rights and retaining the oil rights, and operated as full partners in the transactions. This

situation has been well known to the business world since 1937 and has been upon a partnership basis, the parties sharing equally in the profits, expenses and losses. The investments were of equal value and all the parties performed services to the best of their abilities.

The alleged partnership of M. E. Trapp, Lou Strang Trapp and M. E. Trapp, Jr., as M. E. Trapp, Associated, is the only one of the organizations, it occurs to the court, about which there could be any question, though the evidence is uncontradicted. There need be no speculation as to the terms of the arrangement or the reason for the organization since there was a written contract of partnership (Plaintiff's Ex. 33). The record discloses that M. E. Trapp, Jr., is the son and only child of M. E. Trapp, Sr., and Lou Strang Trapp. In the latter part of 1940, when M. E. Trapp, Jr., had practically completed his education and was about to be married, this partnership arrangement was first discussed between the parties. Mr. and Mrs. Trapp were anxious for their son to engage in some kind of business and the son also was desirous of so doing, but was without capital. The various discussions resulted in the written contract. The character of business had not been decided upon, but the manner in which it was to operate was definitely determined and outlined. The contribution of each as to capital was fixed at forty per cent for M. E. Trapp, Sr., forty per cent for Lou Strang Trapp and twenty per cent for M. E. Trapp, Jr., and the division of profits, if any, was to be in like ratio. M. E. Trapp, Sr., was to be the general manager, M. E. Trapp, Jr., was assigned certain duties, and Lou Strang Trapp was to be consulted and advised with in all transactions. What could be more natural than such a family partnership organization? Here were the father and mother who now desired to see their son succeed. He was without capital. The father and mother, through their business arrangement, had gained considerable experience in business and had been highly successful. The father particularly had demonstrated his ability to conduct, as manager, an organization

of that kind. The son was in a position to fit into such an organization and with proper guidance and assistance become a valuable member of it.

The evidence discloses that after this organization, M. E. Trapp, Jr., was called to military service. Later the organization embarked in the construction business with the Tankersley Construction Company. The Trapp organization was known as M. E. Trapp, Associated. The Tankersley Construction Company and M. E. Trapp, Associated, procured and executed four construction contracts with the government for work connected with the war. Great emphasis has been placed upon the fact that M. E. Trapp, Sr., at times signed instruments in connection with these contracts as an individual instead of M. E. Trapp, Associated. The reason for this has been satisfactorily explained in the evidence and the court does not deem it important, in the face of the written contract of partnership, and finds that in all of the dealings of M. E. Trapp, Sr., with reference to these government contracts, he was acting for and representing the partnership of M. E. Trapp, Associated. Under the ruling, as to family partnerships, in the case of Commissioner v. Culbertson, supra, the court cannot escape the conclusion that M. E. Trapp, Associated, is a valid partnership for all purposes.

As shown by the evidence the joint venture of Tankersley Construction Company and M. E. Trapp, which the court finds was in fact M. E. Trapp, Associated, was entered into sometime in the early part of 1941. Bids for contracts to construct certain projects were submitted by Tankersley Construction Company and M. E. Trapp, Associated, to the government agencies governing such construction work. This is borne out by recitals in the memorandum agreement dated July 10, 1941 (Defendant's Ex. 8). Other exhibits introduced, including defendant's exhibits 12 and 13 and plaintiff's exhibit 37, confirm the conclusion that even though M. E. Trapp signed instruments in his individual capacity, he was in fact representing and acting for M. E. Trapp, Associated. The property described in the deeds of trust (Defendant's Exs. 12

and 13) was the property of M. E. Trapp and Lou Strang Trapp, which was being used to finance the joint venture. Any profits realized from this joint venture by M. E. Trapp, Associated, would inure to the benefit of that partnership in the proportions set out in the partnership agreement (Plaintiff's Ex. 33), both for income tax purposes and all other purposes.

■ The court has been impressed in the hearing of this cause by the apparent views of the administrative officers in the administration of the income tax statutes. More or less confusion has come about by the misinterpretation of the statutes and the decisions. The statutes were not enacted for the purpose of "tax ferreting" or for seizing upon technicalities to force the taxpayer, who reports his income on a legitimate basis, into paying excessive or fanciful taxes. It is burden enough for the taxpayer to pay the legitimate taxes on his income, and every effort should be exerted not to penalize the taxpayer for honest errors in preparing his returns. The income is the result of his initiative, toil and energy, and the "laborer is worthy of his hire." He should be encouraged in his efforts, not discouraged, so long as he works within the framework of the law. Of all institutions, his government, acting through its agencies, should not view his efforts with suspicion but should look through form for substance, and the taxpayer should be entitled to every consideration that is his due. An income tax return, under our system, is a very complicated document. It is doubtful if seventy five per cent of the taxpayers can properly prepare their tax returns, but must have the assistance of those who claim to be experts, and the chances for grave and costly errors are ever present.

■ In all of the situations in this case, it occurs to the court, that in auditing the plaintiff's 1941 return the administrative tax officers have assumed the position that the general law as to business partnerships should be ignored and a different rule applied to such organizations for income tax purposes. Counsel for the defendant stated in their brief (p. 44) that "it is the general rule that the Federal Government does not lose its revenue because of the erroneous ruling of an administrative officer." The court agrees with that statement but wonders why conversely the taxpayer, in any given year, should be penalized because of errors in his bookkeeping, or erroneous rulings of administrative officers, or even erroneous rulings of some court, in some previous year. In other words, each tax return should stand or fall upon the facts pertaining to it for the year the return is made, and the taxpayer should not be bound by findings of fact or rulings on previous returns where the factual situation is not the same. He should be permitted to raise any question bearing on the facts shown in the return, even though a similar question might have been raised in a similar situation in some previous return. No two returns are exactly alike in factual situations, and the factual situation should govern the rulings on each individual return.

■ In the instant case the administrative officer proposed that in the association of M. E. Trapp and Lou Strang Trapp, for the year reported, the earnings should be divided ninety per cent to M. E. Trapp and ten per cent to Lou Strang Trapp in the face of the undisputed testimony that it was a fifty-fifty concern. If the administrative officer had had the benefit of the ruling as to family partnerships in Commissioner v. Culbertson, supra, and other later decisions, he no doubt would not have proposed such a division. A fifty-fifty partnership cannot be construed in such a manner as to determine what portion of the income each partner earns. For example, two lawyers enter into a general partnership to practice law with the agreement that their earnings shall be divided equally. One of the parties, who is especially equipped by learning, ability and experience to handle probate matters, procures a probate case and handles it in the name of the firm. He does everything pertaining to the case from its inception to final distribution and his partner does nothing concerning that case. Could it be said that for income tax purposes all of the fee in that probate case was earned exclusively by the partner who handled the case and that it should be

charged or allocated to that partner alone? Such an idea is absurd and yet in the instant case an administrative officer is proposing such a distribution in the family partnership of M. E. Trapp and Lou Strang Trapp.

The law pertaining to such situations is aptly expressed in the concurring opinion of Mr. Justice Frankfurter in Commissioner v. Culbertson, supra, 337 U.S. at page 753, 69 S.Ct. at page 1219, in these words:

"Recognition of the importance, in applying §§ 181 and 182 [26 U.S.C.A. §§ 181, 182] of the appraisal of facts makes manifest why, quite apart from the definition contained in § 3797, a determination by a State court should not, as the Tower opinion pointed out, foreclose a contrary determination by a federal tribunal charged with administration of the tax laws. Such an inconsistency would not mean that the legal standards applied by each were inconsistent; it would be a result simply of the commonplace that no finder of fact can see through the eyes of any other finder of fact. See [State of] Texas v. Florida, 306 U.S. 398, 411, 59 S.Ct. 563, 570 [830], 83 L.Ed. 817, 121 A.L.R. 1179. Nor would inconsistency be created by a State court's concern for the protection of creditors which lead it to seize upon adoption of the outward form as the vital fact. So, indeed, might the taxing authorities refuse to be precluded from holding the taxpayer to his election to adopt the form of a partnership. Cf. Higgins v. Smith, 308 U.S. 473, 477, 60 S.Ct. 355, 357, 84 L.Ed. 406. The need for guarding against misuse of the outward form of a partnership as a device for obtaining tax advantages is properly satisfied by reliance on the vigilance of the Tax Court, not by distorting the concept of partnership. It is not for this Court, by redefinition or the erection of presumptions, to amend the Internal Revenue Code so as virtually to bank partnerships composed of the members of an intimate family group.

"The present case, nevertheless, is not the first manifestation of an impression that the Tower opinion had precisely such an effect. It seems to me important, therefore, to make crystal clear that there is no spe-cial concept of 'partnership' for tax purposes, while at the same time recognizing that in view of the temptations to assume a virtue that they have not for the sake of tax savings, men and women may appear in a guise which the gimlet eye of the Tax Court is entitled to pierce. We should leave no doubt in the minds of the Tax Court, of the Courts of Appeals, of the Treasury and of the bar that the essential holding of the Tower case is that there is 'no reason' why the 'general rule' by which the existence of a partnership is determined 'should not apply in tax cases where the Government challenges the existence of a partnership for tax purposes.'

"In plain English, if an arrangement among men is not an arrangement which puts them all in the same business boat, then they cannot get into the same boat merely to seek the benefits of §§ 181 and 182. But if they are in the same business boat, although they may have varying rewards and varied responsibilities, they do not cease to be in it when the tax collector appears."

In the recent case of Wenig v. Commissioner of Internal Revenue, D.C.Cir., 1949, 177 F.2d 62, 64, where for all practical purposes the facts are similar to the facts in the instant case, the court said:

" * * * We find no basis of substance for deeming Mrs. Wenig's repeated, vital contributions of capital and services to be selfless donations. It is true, as the Tax Court observed, that a wife is interested in the success of her husband's business, as it provides the livelihood of the family, and it is also true that ideas of employees or friends may often be the source of substantial profit to the owner of the business. But those philosophical generalities cannot be taken to negative a property interest in a wife who contributed all of the initial capital which was put into the business, who twice rescued the business from failure, and who alone designed one of the two products manufactured and sold and helped in material respects to design the other. An assumption that a wife wishes her husband success cannot deny her a property interest when her capital and her services are

in major part the creative force from which the profits came. When a wife supplies the money with which her husband does business, some strong evidence is necessary to support a conclusion that she was not thereby a participant in the venture. We recall at this important juncture that we are not testing the technicalities of partnership under general commercial law; participation in any sort of joint venture is sufficient status. Assumption, without evidence, that a wife's contribution of money and ideas is merely wifely assistance to her husband as such, however justified a century ago, is outmoded as legitimate rationale. * * *

" * * * The record requires a conclusion of joint venture. That this was their intent is established by direct testimony, by circumstance, and by the only permissible inference from the basic facts. To infer that she first contributed, donatively, capital and services to him; that he thereafter gave her, donatively, an interest in the venture; and that, therefore, she was not and did not become a real participant in the venture, is against the clear content of the record. It is not permissible inference from the facts shown."

■ Without going into detail concerning the bookkeeping methods employed by the plaintiff, as to whether the books were kept on a cash or an accrual basis, the important matter to be determined in the situations is whether the books, as kept, reflect the amount of income, by whom earned, and in what proportions the earners of the income should be taxed. The taxpayer testified that his return for 1941 was prepared on a cash basis. The return states that it was prepared on a cash basis, and when the evidence is carefully analyzed, the court is of the opinion that the taxpayer intended to prepare his return on a cash basis.

The evidence as to the 1941 partnership return of Tankersley Construction Company and M. E. Trapp, Associated, is conflicting. While the original 1941 return of the partnership (Defendant's Exhibit 2) does not state whether the return was made on a cash or accrual basis, leaving the question unanswered, the worksheet (Plaintiff's Exhibit 3) sets out the same schedules and compilations as the original return and also bears a checkmark disclosing that the return was made on a cash basis. And when all the evidence is considered pertaining to the return the court feels justified in the conclusion that the return was in fact prepared on a cash basis.

With reference to the deduction of $392, loss from the sale of an automobile, the plaintiff claims that the automobile was the property of M. E. Trapp, Associated, and was being used in the business of that organization at the time of the collision in which it was damaged. The court finds that the automobile was not being used in the business of M. E. Trapp, Associated, at the time of the collision, but was being used for the sole benefit of M. E. Trapp, Jr., on a private mission of his own, and that the deduction was improper and was properly rejected.

When all of the facts and circumstances, as reflected by the evidence, are taken into consideration, aside from the stipulated adjustments and the deduction for loss from sale of an automobile, the court is of the opinion that the 1941 income tax return of the plaintiff correctly allocated the income and the plaintiff should recover the amount prayed for, taking into consideration the stipulated adjustments and the disallowance of the $392 deduction for loss from sale of an automobile.

The court holds that all of the earnings reflected in the return of the plaintiff, from the family partnership of M. E. Trapp and Lou Strang Trapp, should be allocated fifty per cent to each of those parties; that all of the earnings of the Trapp interests in the partnership of Trapp and Blankenship were the earnings of the family partnership of M. E. Trapp and Lou Strang Trapp and should be allocated fifty per cent to each of those parties; that all of the earnings of the Trapp interests in the joint venture of the Tankersley Construction Company and M. E. Trapp, Associated, were the earnings of the family partnership of M. E. Trapp, Associated, and should be allocated forty per cent to M. E. Trapp, Sr., forty per cent to Lou Strang Trapp, and twenty per cent to Marvin Edwin Trapp, Jr

The court is not unmindful of the holding in the case of Trapp v. United States of America, Number 3066-Civil, 73 F.Supp. 385; Id., 79 F.Supp. 320, decided in this court concerning matters involved in the instant case, and affirmed on September 14, 1949 by the Court of Appeals, for the Tenth Circuit, 177 F.2d 1. That cause was decided by the trial court prior to the holding in the Culbertson case, supra. The facts in the case at bar are different and more complete. In Cause Number 3066-Civil the court did not have the benefit of the testimony of Lou Strang Trapp and did not have in that record plaintiff's exhibits numbered 29, 30 and 31 in the instant case. Had the court had the record in that cause as it is in this cause, under the holding in the more recent decisions, in all probability the court would have reached the same conclusion as is reached here.

Proper findings of fact, conclusions of law and a form of judgment consistent with this opinion may be submitted within fifteen days of this date.